# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| *versus* | : | |
| | : | |
| KENTRELL D. GAULDEN | : | CRIMINAL NO. 21-14-SDD-SDJ |
| a/k/a "YoungBoy Never Broke Again" | : | |
| a/k/a "NBA YoungBoy" | : | |
| a/k/a "YB" | : | |

## UNITED STATES' POST HEARING BRIEF

The United States of America, through undersigned counsel, submits its post hearing brief.[1]  The Supreme Court has long held that suppression is an extraordinary remedy and should be used sparingly as a "last resort."  *See e.g., Hudson v. Michigan*, 547 U.S. 586, 591 (2006). The Court has cautioned that suppression should be ordered solely when its effect to deter unlawful police conduct is "worth the price paid by the justice system."  *See Herring v. United States*, 555 U.S. 135, 144 (2009); *United States v. Pope*, 467 F.3d 912, 916 (5th Cir. 2006). Defendant's theme has been plain since the outset and carried out during the hearing.  He flaunts his celebrity status to claim that Baton Rouge Police Department ("BRPD") officers, responding to back-to-back citizen complaints about individuals associated with a rapper walking in their neighborhoods, where multiple shootings had happened in the last five months, with assault style weapons makes **him** the victim of the police.  His story goes that some operation name is relevant to the BRPD's investigation into these citizen complaints[2] and that a police officer

---

[1] The United States incorporates as if fully set out herein its Response in Opposition to Defendant's Motion to Suppress (R. Doc. 66).

[2] Defendant's efforts to connect an operation with BRPD police conduct failed.  Every BRPD officer who testified, initially responded to the citizen complaints in this case, and was asked, had never heard of an operation "Never

writing warrant affidavits in the middle of an ongoing investigation amidst a chaotic scene made materially false statements or acted with a reckless disregard for the truth to target defendant.

The real facts reveal that the peaceful citizens residing in and around Chippewa Street are the victims. They routinely called police to protect their neighborhood. In this matter, both complainants, a reliable source and a 9-1-1 caller, desired to remain anonymous, presumably because they feared retribution from an individual enamored by his status. The BRPD officers responded both appropriately and legally. In short, defendant has failed to meet his burden and show that the judicially authorized warrants contained an intentional or reckless false statement that if removed would destroy probable cause or undermine the officers' "good faith reliance" on the warrants. *See e.g., Franks v. Delaware*, 439 U.S. 154 (1978); *Leon v. United States*, 486 U.S. 897 (1984). Accordingly, under well-established Supreme Court and Fifth Circuit case law, this Court should deny defendant's motion.

As an initial matter, defendant has challenged only one warrant that yielded evidence the Government would offer at trial.[3] The only live issue pertains to suppression allegations regarding the search warrant for Marvin Ramsey's camera and SD Cards.[4] The Government

---

Free Again." *See e.g.,* Hrg. Tr. Day 1 at 182:2-3; 210:2-5 (Barcelona); 137:19-22; 173:2-4 (Kennedy); Hrg. Tr. Day 2 at 14:23-25; 15:6-10 (Garic).

[3] The United States has previously noted in its Opposition to the Motion to Suppress, "Defendant's Motion challenges three warrants pertaining to: (1) a Cadillac Escalade; 2) a Dodge Ram truck, which defendant mistakenly asserts is where officers found the Masterpiece Arms 9 mm weapon charged in the Indictment; and 3) Ramsey's camera, SD Cards, and Computer. The two guns that defendant is charged with possessing were found on Marvin Ramsey's person and in the Acura SUV, respectively. Defendant's motion does not challenge either search or seizure." Further, the Court found defendant lacked standing to challenge a weapon found on Ramsey. Hg. Tr. Day 3 at 66:17-20.

[4] Defendant did not call Ramsey. He relied instead on third party witnesses from Atlantic Records and Red River Bank to support his standing claim to contest video on a camera and SD cards belonging to Ramsey. The information in dispute uniquely resides within Ramsey's knowledge and the defendant's failure to call his supposed "camera man" witness should result in a finding that Ramsey sworn testimony would have been unfavorable to defendant's position. *See United States v. Wilson*, 322 F.2d 353, 363 (5th Cir. 2003)(explaining adverse inference arising from a missing witness).

showed in its timely filed opposition that defendant's arguments lacked merit. Defendant

continues to aver that affiant's reference to an event occurring on September 28, 2020 when he

received the information, not on September 27, 2020 when the event occurred, constitutes a false

statement or a statement made with reckless disregard for the truth such that a search warrant

should be voided. The paramount issue, therefore, is whether the affiant's reference to a date

that fused together two anonymous, and back-to-back, similar complaints concerning defendant

and his cohorts roaming Chippewa Street with assault style weapons was made intentionally or

recklessly to mislead the state court judge about a material fact such that 1) the officers' good

faith reliance is inapplicable; or 2) when the dates and information are correct, the warrant lacks

probable cause and is void. *See Leon*, 486 U.S. at 922-23; *see also Franks*, 438 U.S. at 155-56;

*United States v. Ortega*, 854 F.3d 816, 826 (5th Cir. 2017) ("Ortega I"). As we show below,

neither the facts nor the law support invalidating the search warrant.

## I.    FACTS

The Government incorporates herein its facts from R. Doc. 66. The matter emanates

from two concerned Baton Rouge citizens' anonymous complaints on September 27 and 28,

2020. Both concerned young black males congregating on Chippewa street with weapons and

both referred to a rapper. One complaint was from a reliable source to a senior member of the

BRPD. The other was an emergency 9-1-1 call. Officers serving the community responded.

## II.   ARGUMENT

### A.  Factual Background in which Corporal Barnett Prepared the Search Warrant

On Sunday, September 27, 2020, a senior BRPD officer contacted Sergeant Jesse

Barcelona ("Barcelona"), who was assigned to uniform patrol, to relay that a reliable source

informed him "that the group BBG and NBA were possibly out on Chippewa Street shooting a
rap video in front of a vacant house and out in the street with guns." Hrg. Tr. Day 1 at 182:15-
19. He asked Barcelona if "could look into that situation." *Id.* at 19. Barcelona, and "almost
half, if not more than half," of his uniform patrolmen, who were responsible for patrolling Baton
Rouge and protecting all citizens, responded to Chippewa Street. *Id.* at 184:7-10. Barcelona
explained that the information led him to believe he would possibly encounter a "large group of
people that had possible weapons in front of vacant houses and in the streets." *Id.* at 185:7-9. He
had no idea who all he would encounter but knew that there would possibly be individuals with
weapons. *Id.* at 185:10-11. Seeing this did not fit their narrative, defense counsel asked: "But,
you did --- you know form your past observations that this is the general area where [defendant]
has family?" *Id.* at 185:12-14. Barcelona responded: "He has been known to hang out in that
location." *Id.* at 185:15. **The true facts**: Barcelona's response to the scene was unrelated to any
individual and was in response solely to the information provided by the reliable source as
relayed to him by a senior BRPD officer. *Id.* at 220:5.

    In addition, as a patrolman, Barcelona knew other true facts. Specifically, Barcelona was
aware that in the past two months leading up to September 2020, "there had been five shootings
in that area." *See Id.* at 213:8-11. He noted that "there were several shootings in that small, little
area." *Id.* at 13. Barcelona also explained that he takes calls involving music videos seriously
"because they've been known to have violence follow them. We see a lot of videos that occur.
And we've also seen a lot of people who have been shot in the making of these videos." *Id.* at
219:20-25-220:1-2. **The true facts**: Defendant has not and cannot refute that such violence is a

4

part of the totality of the circumstances that officers encountered at Chippewa Street in September 2020.

Barcelona testified that, when he arrived at Chippewa Street, he was "looking for people with firearms that would pose a danger to the citizens … [he] wasn't looking for any members of any group, just any illegal activity." *Id.* at 187:5-8. He responded affirmatively when asked – "So the information provided was there was two distinct groups out there **brandishing** weapons. Right?" *Id.* at 187:16-18 (emphasis added).[5] Barcelona saw members of both NBA and BBG at the Chippewa location but could not specify which individuals were associated with the different groups. *Id.* at 188:7-8. Barcelona explained that he "saw people running … The information we had received prior to this was that there were people out there – known members of groups that are – have been known to have shootings and stuff go on around them." *Id.* at 192:23-193:2. He also stated that, "when we pull up, we do see people take off running. That does raise our suspicion that possibly a crime has been committed or is being committed. So at that point, we are going to take a little bit more concern for our safety." *Id.* 193:3-6. Barcelona, and his fellow patrolmen, did not find any weapons that day, but they "didn't really have enough manpower to do a really good search … once [they] established that there was nobody in plain view with weapons or anything like that … [Barcelona] started making [his] way to the homeowners." *Id.* at 188:17-21.

Barcelona was called out to Chippewa by a senior BRPD officer. To fulfill his responsibility to the citizen making the complaint and those endangered by defendant's conduct,

---

[5] Defendant criticizes Corporal Barnett referring to individuals walking on the street visibly holding assault weapons as "brandishing." (*See* Hrg. Tr. Day 3 Red. at 84:13-22). Yet, when the defense questioned Barcelona, the defense attorney described the conduct the same way. Thus, no negative inference should be drawn from Barnett's use of the same word.

he met with defendant's "purported grandfather"[6] and sought his assistance with keeping the neighborhood safe. *Id.* at 194:12-14. Barcelona very calmly telling defendant's "purported grandfather" that there was a complaint about "a bunch of people being out here possibly shooting a music video with guns" corroborates the existence and substance of the complaint by the reliable source, a concerned citizen. Def. Ex. 44. Prior to Barcelona's calm encounter, defendant can be seen trying to intimidate Barcelona and can be heard swearing at him. U.S. Ex. 6, Hrg. Tr. Day 1 at 215:4-6. Defendant told Barcelona that he would "sue the f*** out of him." U.S. Ex. 6. Barcelona concluded the contact "after six to ten minutes" because he lacked necessary manpower and the call had already removed more than half his officers from uniform patrol who were responsible for protecting Baton Rouge's streets. Hrg. Tr. Day 1 at 194:22-25, 196:13-15, 216:12-15.

On September 28, 2020, a concerned citizen called 9-1-1 stating, "I'm callin' I have loved ones live over there [on Chippewa Street], it's on with this here lil rapper whatever. They got so many of them over there with Uzis and AK guns just walkin' up and down the street." U.S. Ex. 2. The complainant explained that the individuals toting assault style weapons were "on Chippewa right off of 38th street goin' towards Foster Driveway." *Id.* The complainant described the individuals: "They got dreads um.. twists in they head. They black males and" *Id.* The complainant told the 9-1-1 dispatcher that they saw "[a]bout seven of them" and that "all the

---

[6] Defendant's attempts to spin the narrative are readily apparent from how the defense refers to this individual. At times, the defendant refers to his grandfather as "Pawpaw" while in other instances he is referred to less endearingly as defendant's "purported grandfather." Hrg. Tr. Day 2 at 22:19-23. Whatever the relationship, this individual was in court, and defendant did not call him to testify either. The Court can and should draw an adverse inference for the defense's failure to do so as his testimony would likely have undermined their account concerning events on September 27 and 28, 2020 on Chippewa Street. *See Wilson*, 322 F.2d at 363.

ones [they had] seen" were carrying firearms.  The complainant expressed concern because "we

got a lot of older people, senior citizens, homeowners" that reside on the street. *Id.*  The

complainant described the black males as "they standin' in front of a house.  I don't know if it's

the boy grandparent or who." *Id.*  The complainant stated "we always calling 'em [the Police]

out there and I just hope they don't wait 'til they leave cause that's, you know, too much are

goin' on over there." *Id.*  The complainant stated that they wished to remain anonymous. *Id.*

This 9-1-1 call, a mere 24-hours after the September 27, 2020 reliable source complaint, reveals

that the **true victims** are the citizens of Baton Rouge living in the Chippewa Street

neighborhood, not defendant.

When Barcelona heard the dispatch call on September 28, 2020 and knowing that "we

had had a large crowd out there the day before," he contacted the Street Crimes Unit to assist -

specifically Sergeant David Kennedy ("Kennedy").  Hrg. Tr. Day 1 at 197:15-23.  Barcelona

informed Kennedy of the 9-1-1 call and relayed information conveyed to Barcelona the day prior

regarding the reliable source. *Id.* at 221:0-13; 223:4-13.  Kennedy subsequently told Corporal

Josh Barnett ("Barnett") "that Sergeant Barcelona had called [him] on the phone and told [him]

that there was an incident the day before where an informant had called and given information

about them being out there, about the NBA and TBG being out there – or BBG.  I'm sorry.  And

this incident that day was a call that the same type of event was going on again, and he asked that

we come and assist him." *Id.* at 133:24-25, 134:1-5.  Kennedy noted that Barcelona told him

"He was one of the only few people out there and that people had run from him.  And he didn't

have enough people to handle the situation [on the 27th].  So … he requested additional units [on

the 28th].  Hrg. Tr. Day 1 at 134:23-135:1.  As Kennedy approached Chippewa, he "could see a

lot of people in the street.  And as soon as they saw [Kennedy's] car turn the corner, they – a few of them started to run." *Id.* at 136:9-12.  He explained "because … the totality of the circumstances, the information that we had and the fact that people were running and they were trying to evade police contact, we attempted to detain everybody on scene" while we investigated.  *Id.* at 136:18-23.

Officers encountered a "very difficult" scene in which there was "all kinds of drama."  *Id.* at 169:1, 171:14-23.  Corporal Douglas Chutz ("Chutz") described the scene as "pretty chaotic." Hrg. Tr. Day 2 at 64:22-23.  "People were running and we had officers chasing people … we were trying to just kind of contain everything till we could sort everything out and figure out if there was anyone involved in criminal activity."  *Id.* at 59:1-5.  Both Barcelona and Barnett gave chase to those who fled.  Chutz observed defendant attempt "to walk away several times despite being told to stay in that area where he was."  *Id.* at 59:11-12.  Defendant, unlike everyone else, continued disregarding Chutz's orders and continuously attempted to walk away.  *Id.* at 85:12-18.  Defendant's entitled behavior exhibited the day prior remained a fixture on the 28th.  Chutz emphasized that unlike the other individuals whom the BRPD detained, defendant "chose not to follow [instructions]" and instead walk[ed] in the opposite way."  *Id.* at 63:15-17:20.

Defendant's behavior, failing to follow law enforcement commands, resulted in Chutz placing the defendant in handcuffs and an investigatory detention.  Contrary to defendant's allegation, Chutz detaining defendant had nothing to do with who he is or his celebrity status. **The true facts:** Chutz "had absolutely no idea who [defendant] was."  *Id.* at 66:17.  He was asked, "with all the gold and chains with NBA **and all that** you did not know that that was [defendant]?  Chutz, replied that he "had absolutely no idea.  And if you keep playing [the body

camera video,] you'll see me ask him his name." *Id.* 66:18-21. The only difference, in the minds of officers, between defendant and the other individuals out there was that defendant failed to listen to officers who were trying to control a chaotic scene and appeared to be trying to walk away.

In addition to these officers' observations, irrefutable security camera footage corroborates the anonymous 9-1-1 caller by, showing individuals discarding firearms, and fleeing the scene as police arrive. It also shows Marvin Ramsey fleeing the scene after having close contact with defendant just as police arrive. U.S. Ex. 2-1, Hrg. Tr. Day 3 Red. at 61:17-20, 62:1-6. A semi-automatic weapon was found concealed on Ramsey. These incontrovertible facts undermine wholly defendant's assertion that Ramsey did nothing wrong. Hrg. Tr. Day 1 at 200:13-25. **The true facts**: Ramsey ran from a crime scene possessing a concealed semi-automatic weapon that defendant is charged with possessing. That alone gave Barcelona ample reasonable suspicion to stop him, detain him, and recover evidence that may turn out to be relevant to an ongoing investigation in its early stages at a chaotic scene.

> B. Legal Framework Within Which Corporal Barnett Wrote the Warrant
> Affidavit

Fourth Amendment law supports the officer's actions in detaining defendant and seeking search warrants. *See e.g., United States v. Legard*, 515 F. Supp.3d 488, 496-497 (M.D. La. 2021). There, this Court held that a defendant acting evasively, refusing an officer's commands to "stay over here," and moving in a manner to avoid police contact justifies a detention. *Id.* There is no ticking stopwatch on an investigatory detention. *See United States v. Sharpe*, 470 U.S. 675, 686-687 (1985). Here, officers detained defendant based on his evasive conduct, which was different from other the conduct of the other detainees, only as long as necessary to

secure the active crime scene, obtain search warrants, and process those detained.  At all times,

the officers acted thoroughly, swiftly, and constitutionally.[7]  The Supreme Court counsels that a

court assessing such a situation "should not indulge in unrealistic second guessing."  *Id.* at 686.

Barnett was assigned as lead detective, after chasing down fleeing suspects, amid the

difficult and "chaotic" scene.  Hrg. Tr. Day 3 Red. at 127:13-24; *see also Id.* at 126:7-25, 127:1-

9; Hrg. Tr. Day 1 at 169:1, 171:14-23 (Kennedy describing "drama"); Hrg. Tr. Day 2 at 64:22-23

(Chutz describing chaos).  Barnett was not present at the September 27, 2020, encounter with

defendant and was fielding information from numerous officers on scene.  *Id.* 127:10-12, 128:1-

11, 132:4-10.  An affiant is not required to have firsthand knowledge of the offense alleged to

have been committed or all facts underlying the affidavit.  *See Ortega I*, 854 F.3d at 829 (an

affiant can rely on other officers for information contained within the affidavit establishing

probable cause)(citing *United States v. Neal*, 182 F. App'x 366, 371 (5th Cir. 2006)); *Aguilar v.*

*State*, 341 F. Supp. 1294, 1296 (S.D. Tx. 1972)(habeas case where the court noted affiant may

rely on information concerning a reliable source from a fellow officer in a warrant affidavit).

*See also State v. Jenkins*, 338 So.2d 276, 280 (La. 1976).  A search warrant affidavit carries a

presumption of reasonableness.  *Franks*, 438 U.S. at 171-72.  Searches pursuant to judicially

---

[7] Defendant's focus on Corporal Garic's search of the abandoned Cutlass – which as the Court opined "if relevant at
all, [is] marginally relevant." (Hg. Tr. Day 2 at 27:19-20) – reflects constitutionally sound police work.  The
abandoned Cutlass' driver side door was open, and Garic observed a pill in plain view that was wrapped in
cellophane.  *See* Hg. Tr. Day 2 at 41:7, 42:22-25, 43:1-6. *See United States v. Barlow*, 17 F.3d 85, 88 (5th Cir. 1994)
(an officer may enter an abandoned vehicle without a warrant because no expectation of privacy). *See also Peyton v.*
*New York*, 445 U.S. 573, 586-87 (1980) (seizure of contraband in plain view presumptively reasonable).  Garic
noted simultaneous to the plain view search on his body camera footage and again under examination that he
smelled a marijuana odor around the Cutlass.  *Id.* 41:19-22, 43:17-21, 44:14-20. This too authorized him to stick his
head into an open and abandoned vehicle. Discarded firearms also were being recovered around the Cutlass.  *Id.*
43:22-24.  Garic later obtained consent to search the Cutlass based on instructions given to him in the event facts
developed in the investigation that warranted a more exhaustive search.  *Id.* 46:2-12.  For example, to enter areas not
subject to plain view – *i.e.,* the trunk.  There were no facts developed requiring officers to search the Cutlass further.
Thus, assuming the search is relevant, Garic and other officers on scene acted within the law in how they searched
an abandoned vehicle with drugs in plain view.

authorized search warrants are presumptively valid.[8]  *See Riley v. California*, 573 U.S. 373, 381-82 (2014)(explaining that a judicial warrant reflects reasonableness of a law enforcement search); *Masserschmidt v. Millender*, 565 U.S. 535, 546 (2012) ("where the alleged Fourth Amendment violation involves a search or seizure pursuant to warrant, the fact that a neutral magistrate has issued the warrant is the clearest indication that the officers acted in an objectively reasonable manner[.]") (internal citation omitted); *United States v. Goldenberg*, No. 05-CR-1034, 2006 WL 266564 at *2 (S.D.N.Y. Feb 3, 2006) ("searches conducted pursuant to a warrant are presumptively valid"); *see also Rundus v. United States*, No. 3:06-cv-1032P, 2010 WL 1254335 at *11 (W.D. Tx. Mar. 30, 2010) (searches pursuant to a warrant are presumptively reasonable).

Defendant's unsupported general allegation devolves to his belief that Barnett – who was drafting warrants in his unmarked police vehicle amidst the hustle and tussle of an ongoing and active crime scene -- deliberately lied or "showed a reckless disregard for the truth" when submitting warrants through a computer platform to a state district judge.  *Franks v. Delaware,* 438 U.S. 154, 171-172 (1978); *see also Illinois v. Gates*, 462 U.S 213, 234 (1983)(affidavits drafted in the haste of an ongoing criminal investigation do not require elaborate specificity).

---

[8] Defendant's grossly late filed supplemental motion to suppress mints a new approach– without citing any legal authority -- to suppress "all evidence." R. Doc. 21-14.  Defendant ignores altogether that he has not shown, and cannot show, standing to suppress "all evidence."  Nevertheless, defendant was permitted to attack a search warrant for an Acura vehicle.  The warrant listed the vehicle to be searched, the Acura, and evidence to be found and seized related to crimes alleged, which include drug distribution.  Def. Ex. 79.  The questioning, in essence, was another unfounded attack on Barnett's trustworthiness.  Defendant suggests, without foundation or good faith, there was no evidence of distribution by defendant and his entourage.  *See* Hrg. Tr. Day 3 Red. at 119:4-9.  The **true facts** do not support defendant.  Barnett testified that officers located numerous digital scales scattered throughout the scene and one found in the Acura.  Seemingly changing gears mid-examination because evidence of drug distribution **was found** in the Acura– the defense turns to an obtuse position that digital scales, which are well-known tools of the drug dealing trade are not "inherently illegal" because they can be bought at "Walmart" or "on Amazon."  Hrg. Tr. Day 3 Red.  at 130:14-25.  This is another failed effort to undermine Barnett's credibility.  It has no bearing whatsoever on whether Barnett and his fellow officers acted in good faith in executing judicially authorized warrants for Marvin Ramsey's SD cards and camera.

11

Defendant repeatedly takes issue with the language of the camera and SD card warrant, the scope of authority conveyed by the warrant, and what Barnett's beliefs were regarding the scope of authority.  Hrg. Tr. Day 3 Red. at 76:23-25, 77:1-4, 77:22-25, 78:1-2.  Barnett's beliefs are reasonable based on the request that he himself put in the warrant affidavit.  The affidavit states, "I respectfully request permission to look through the Sony 7r camera, SD cards, and Macbook Pro to help determine who had possession of which firearm."  Def. Ex. 26.  It is only reasonable to believe that Barnett had such authority, and believed he had such authority, upon the state district judge signing the warrant.  Hrg. Tr. Day 3 Red. at 131:5-25.[9]

The Court's inquiry boils down to: (1) did Barnett's affidavit contain a false statement?  *United States v. Singer*, 970 F.2d 1414, 1416-17 (5th Cir. 1992); (2) if there is a false statement, did Barnett make the false statement with intent or reckless disregard for the truth?  *United States v. Looney*, 532 F.3d 392 (5th Cir. 2008); and (3) if the Court excises the false statement (assuming one exists), does the warrant still satisfy probable cause?  *United States v. Froman*, 355 F3d 882, 889-891 (5th Cir. 2004).  Defendant has shown neither a lie nor a reckless disregard for truth – or any intent to mislead.  Unless defendant makes a strong preliminary showing that the Barnett knowingly, intentionally, or with reckless disregard for the truth included materially false information in the affidavit, "the Fourth Amendment provides no basis for a subsequent attack on the affidavit's integrity."  *See United States v. Tomblin*, 46 F.3d 1369,

---

[9] Defendant complained about language in the warrant that Barnett did not write. The testimony shows that the Cloudgavel warrant system prompts the affiant to enter certain information and a narrative and the system then "plugs" in additional language for the warrant and this complained of language was plugged in.  *Id.* at 142:20-24, 141:11-14.  Therefore, defendant's attempts to impugn Barnett with language that is not his language do not establish bad faith on his part or reveal any material misstatement or intent to mislead.

1377 (5th Cir. 1995). The Court's inquiry should end here. The evidence should not be suppressed. *See e,g., United States v. Kendrick*, 980 F.3d 432, 442 (5th Cir. 2020).

Putting aside defendant did not meet this threshold requirement, he sought to dispute through law enforcement witnesses, including Barnett, the specifics of anonymous citizen complaints on September 27th and 28th, 2020. In particular, he contested whether a rap video was being filmed. Barnett acknowledged that he was receiving information regarding two different, but similar complaints on two separate dates -- September 27th, and September 28th -- that he inadvertently fused together. Hrg. Tr. Day 3 Red. at 100:6-10. Regardless of this mistake, defendant cannot dispute that BRPD was informed by the reliable source on September 27, 2020, that "a bunch of people being out here **<u>possibly</u>** shooting a music video with guns." Def. Ex. 44 (emphasis added). Undeterred, defendant repeatedly challenged the officers, including Barnett, whether there was in fact a rap video being filmed. Hrg. Tr. Day 3 Red. 99:9-18. Barnett was informed by other officers that there was a report of a rap video being filmed and that he had no reason to not believe that information. *Id.* at 133:13-18, 138:23-25, 139:1; *see also* Def. Ex. 44. Defendant's attempt to impeach Barnett regarding the existence of a rap video has no "rhyme or reason", is inconsistent with their own evidence, and does not uncover any false statement or show Barnett had any intent to mislead the state court judge.

In *United States v. Ortega* (*See* Hrg. Tr. Day 1 at 89:9) the Fifth Circuit remanded to the district court for it to make a factual determination as to whether the affiant "possessed the requisite intent" to make a false statement in his warrant affidavit. *See Ortega I*, 854 F.3d 818, 829 (5th Cir. 2017). The false statement identified in *Ortega* related to whether the affiant misled the court about interaction with a confidential source. *See id*. 827. From its inception,

therefore, *Ortega I* is factually distinguishable because there is no evidence that Barnett made a false statement or recklessly disregarded facts. Importantly, and as applicable to case at hand, the *Ortega I* court, following the Magistrate Judge's reasoning that a statement, which could have been more "precise and definite" is not a lie provided, as it does in Barnett's situation, the statement "fairly fit the facts as they occurred." *See id.* at 826. Barnett admitted the dates were an error based on his understanding of the events, which other than the date were correct.

When remanded, the district judge held a second suppression hearing. *See United States v. Ortega,* 719 Fed. App'x 319, 322 (5th Cir. 2017) (*Ortega II*). The affiant testified that "he believed the affidavit was truthful." *Id.* As pertinent here, the affiant in *Ortega II* "thought he received the information from the informant because he was present when the information was conveyed … he saw no need to explain that he [was working with another officer who was translating the information for the affiant who spoke less fluent Spanish]." *Id.* The affiant, like Barnett here, testified that he did not deliberately omit the information to secure the warrant. *Id.* And, unlike Barnett in the present case who was writing affidavits in his police car while receiving information at an active and chaotic crime scene, the affiant in *Ortega II* had "'no need to rush on anything.'" *Id.* That factor weighs in favor of upholding the warrant in the present case. *See Ortega II*, 719 Fed. App'x at 327 (noting that lack of rushed circumstances favored the movant). The district judge found that the officer "lacked an intent to mislead." *Id.* at 324. The question before the Circuit in *Ortega II* was whether the affiant intentionally or recklessly misled the magistrate judge by overstating his personal knowledge; to wit: "*he* receive[d] information from' the informant." *Id.* As the Circuit explained – for the movant to prevail on suppression "he must show more than mere "'negligence or innocent mistake'" on the affiant's part. *Id.* The

14

Circuit concluded "that the district court did not clearly err when it found that [the affiant officer's] statement was made without reckless disregard for the truth." *Id.* The Court explained – "Put simply, the less damaging the whole truth is to the affiant, the weaker the inference that the affiant made a statement or omission with reckless disregard for the truth." *See id.* at 325. The vital factor is the affiant's plausible understanding of his affidavit. There, the Circuit noted that the affiant's view that he was present when the information, albeit with help of another officer's interpreting, constituted a plausible understanding of the affidavit. In this case, Barnett, at worst, was mistaken about the date. However, Barnett's plausible understanding that the affidavit is correct stems from the fact that he received the information from his Street Crimes Unit supervisor, Kennedy, on September 28, 2021, who had received it from Barcelona also on September 28, 2020. In his affidavit, Barnett advised the state district judge that his unit received the information on September 28, 2020. Factually, the statement is correct and Barnett had no reason to believe that it wasn't correct when he drafted the affidavit amid the chaos on Chippewa Street on September 28, 2020.

Barnett had no reason to question information he was receiving from his fellow officers. *Id.* 132:18-25, 133:1-25, 134:1-8. Kennedy, in turn, had no reason to question information from Barcelona, who, in turn, had no reason to question information received from an informant through a senior BRPD officer. Barnett acknowledged that the influx of information that he was receiving regarding two different dates became inadvertently fused together and was a mistake. *Id.* 100:6-10. The law allows Barnett to rely on information from other officers regarding information from a reliable source. In addition to *Ortega I* and *II*, a similar situation occurred almost fifty years ago where a Houston officer claimed that "Affiant**s** received reliable

15

information" but the affiant only received the information through a fellow officer. *See Aguilar*, 341 F. Supp. 1294 (S.D.T.X. 1972) (emphasis added) (denying habeas on the grounds that information passed from officer to another can be represented as the affiant receiving the information too). Thus, under the reasoning in *Ortega II* and *Aguilar*, neither facts nor law support the theory that Barnett intentionally or recklessly misled the state court judge and, so, suppression is inappropriate.

Finally, the Supreme Court in *Illinois v. Gates* held that "affidavits are 'normally drafted by non-lawyers in the midst and haste of a criminal investigation. Technical requirements of elaborate specificity … have no proper place in this area'." 462 U.S. 213, 234 (1983) (quoting *United States v. Ventresca*, 380 U.S. 102, 108-9 (1965)). Had Barnett executed the elaborate specificity that the defense claims he should have, the accurate information parsed out over a two-day period that the defendant and his entourage had been disturbing the community to an extent requiring two concerned citizen complaints regarding the exact same conduct would have only made the affidavits stronger, not weaker. Defendant's argument that Barnett would mislead or be reckless with these damning facts further supporting probable cause defies logic or common sense.

### C. A Final Word on Standing

Ending where the Court must begin, we turn back to standing. The Court found defendant had standing to contest the "SD card or video images" in Ramsey's camera based on defendant's commercial interest. *See* Hrg. Tr. Day 1 at 145:12-25. Critical facts and law do not support the Court's finding.

First, Red River Bank witness, Karen Boss, testified that the only transfer to Marvin Ramsey occurred in July 2020 (three months before the events in this case) and was drawn from

16

an account owned by Big38Entertainment, LLC.[10]  *See id.* at 96:19-22; and Def. Ex. 49.  The

payment referred to Ramsey as a "camera man." *Id.* at 96:21-22.  Thus, there is no dispute that

the payment to Ramsey came from a business account – not defendant's personal bank account.

Second, Atlantic Records Chairman, Julie Greenwald, explained that Atlantic controls

defendant's image.  *See* Hrg. Tr. Day 1 at 43:6; 111:19-22.  Defendant must work through

Atlantic to use footage to promote himself.  *See id.* at 111:17-25.  The use of defendant's

likeness would be based on an agreement that Atlantic, its lawyers, and defendant's lawyers

develop.  *See id.* at 112:6-10.  Ms. Greenwald's testimony establishes that defendant does not

have full control over his image.  Therefore, those images on Ramsey's camera and SD cards

paid for by an LLC and reimbursed by Atlantic, and under contract to Atlantic, are not images

over which defendant has a possessory interest.[11]  Also, Ms. Greenwald confirmed that

defendant's videos are for commercial purposes. *See id.* at 115:5-7.

Third, Lily Thrall, another Atlantic Records witness, testified that she is not present when

video is filmed.  *See id.* at 125:11-12.  Ms. Thrall claimed never to receive "raw" footage based

on "file format."  *See id.* at 125:15-17.  She admitted having no idea what the video looked like

at the time it was shot.  *See id.* at 125:21-23.  More importantly, Ms. Thrall confirmed that all

defendant's video is shot to promote his music and "his lifestyle."  *See id.* at 125:24-126:1. Ms.

Thrall also admits that the video is shot for a "commercial purpose."  *See id.* at 126:3-4.

---

[10] Defendant did not call Ramsey. *See supra* n. 4.

[11] Ms. Greenwald. testified that she had a "longstanding personal relationship" with defendant.  *Id.* at 49:3-6.
Atlantic's records show – and Ms. Greenwald explained, in detail – that Atlantic would reimburse defendant for
video expenses.  *See e.g.,* Hrg. Tr. Day 1 at 113:22-24;114:4-6.  However, when it came to this transaction with
Ramsey, she suddenly lacked knowledge because it is "below [her]."  *Id.* at 114:2-3.

Standing in the Fourth Amendment context hinges on "(1) whether defendant is able to establish an actual, subjective expectation of privacy with respect to the place being searched or items being seized; and (2) whether that expectation of privacy is one which society would recognize as reasonable." *See United States v. Kye Soo Lee*, 898 F.2d 1034, 1037-38 (5th Cir. 1990) (quoted in *United States v. Gomez*, 276 F.3d 694, 697 (5th Cir. 2001). In this case, the places to be searched belonged to Ramsey, the owner of the SD cards and camera, and the company that paid for the camera footage -- Big38Enterprises LLC, or Atlantic Records. None of these individuals or entities is defendant. *See e.g.,* Hrg. Tr. Day 1 at 96:19-22; 111:17-25. Plus, despite Ms. Thrall's claim that she does not receive "raw" footage from defendant based on "file formats," Ms. Thrall has no idea how the video looks when it's shot because she is not present. *See id.* at 125:21-23. Defendant lacks a cognizable property interest in the video.

Both Ms. Greenwald and Ms. Thrall admit – and the transfer to Ramsey from an LLC business account shows-- that defendant's video footage serves a commercial purpose. *See id.* at 115:5-7 (Ms. Greenwald); 125:24-126:1 (Ms. Thrall). Indeed, in his pleadings, defendant concedes that he knowingly and willingly subjected his personal life to filming in a commercial context for financial gain. Assuming for argument that defendant has a cognizable interest, it is, therefore, commercial.

Supreme Court precedent holds that "property used for commercial purposes is treated differently for Fourth Amendment purposes." *See Minnesota v. Carter*, 525 U.S. 83, 90 (1998); *see also New York v. Burger*, 482 U.S. 691, 700 (1987) (explaining expectation of privacy in commercial property is different from and less than individual property). Assuming even further that defendant could show a subjective expectation of privacy in the commercial video, which

18

was on Ramsey's SD cards/camera, paid for by a LLC and reimbursed by Atlantic Records for images that Atlantic Records has a property interest in, it is not a privacy interest that society would be prepared to recognize as legitimate. *See e.g., Carter*, 525 U.S. at 90 (concerning commercial property versus personal property). *See also United States v. Beaudoin*, 979 F.3d 1092, 1097 (5th Cir. 2020) (explaining the Circuit's standing analysis); *see also e.g., United States v. Moya-Breton*, 329 Fed. App'x. 839, 843-44 (10th Cir. 2009) (denying standing on grounds moving party had no reasonable expectation of privacy in photograph found in camera of another individual despite moving party's understanding that the photograph would be erased or kept secret). Defendant's failure to prove by a preponderance that he has standing to contest the searches pretermits any further review. For all these reasons, defendant lacks standing to pursue suppression.

### III.    CONCLUSION

In sum, assuming the Court finds standing, defendant has shown neither that Barnett misled or showed reckless disregard for the truth in writing a search warrant affidavit during an ongoing and chaotic criminal investigation in which he fused together dates concerning two separate and anonymous complaints within twenty-four hours regarding the same conduct on Chippewa Street. Barnett referenced the day he, in fact, received the information as a member of the BRPD Street Crimes Unit – September 28, 2020. The BRPD officers acted in good faith reliance on the affidavit and judicially authorized search warrants. *Leon*, 468 U.S. at 922-23.

There is no unlawful police conduct to deter and, so, the application of the exclusionary rule is inappropriate.  *See Hudson,* 547 U.S at 591 (2006); *see also Leon*, 468 U.S. at 919-920.

Accordingly, the Court should deny defendant's Motion to Suppress.

<div style="margin-left:40%">

UNITED STATES OF AMERICA, by

ELLISON C. TRAVIS
ACTING UNITED STATES ATTORNEY

/s/ William K. Morris
William K. Morris, LBN 28694
Assistant United States Attorney
777 Florida Street, Suite 208
Baton Rouge, Louisiana 70801
Telephone: (225) 389-0443
Fax: (225) 389-0561
E-mail: william.morris2@usdoj.gov

/s/ Kenneth P. Kaplan
Damaré Theriot, DCBN 1013801
Kenneth P. Kaplan, DCBN 460614
Trial Attorneys
Organized Crime and Gang Section
U.S. Department of Justice
1301 New York Avenue, N.W.
Washington, D.C. 20005
Tel: 202-514-0032
E-mail: damare.theriot@usdoj.gov
E-mail: kenneth.kaplan@usdoj.gov

</div>