DEFENDANT'S
EXHIBIT
74.

1     UNITED STATES DISTRICT COURT

2     CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3     HONORABLE MARIA A. AUDERO, U.S. MAGISTRATE JUDGE

4

5     UNITED STATES OF AMERICA,        )
                                        )
6              PLAINTIFF,               )     CASE NO.
                                        )
7          vs.                          )     CR 21-MJ-01413
                                        )
8     KENTRELL GAULDEN,                 )
                                        )     PAGES 1 TO 62
9              DEFENDANT.               )
      ──────────────────────────────   )

10

11

12

13                REPORTER'S TRANSCRIPT OF
              DETENTION HEARING VIA VIDEOCONFERENCE
14               TUESDAY, MARCH 23, 2021
                        5:46 P.M.
15              LOS ANGELES, CALIFORNIA

16

17

18

19

20

21

22

23     ──────────────────────────────────────────────

              MIRANDA ALGORRI, CSR 12743, RPR, CRR
24            FEDERAL OFFICIAL COURT REPORTER
              350 WEST 1ST STREET, SUITE 4455
25            LOS ANGELES, CALIFORNIA 90012
              MIRANDAALGORRI@GMAIL.COM

```
 1                    APPEARANCES OF COUNSEL:

 2


 3    FOR THE PLAINTIFF:

 4         NICOLA T. HANNA
           UNITED STATES ATTORNEY
 5         BY:  DAMARE THERIOT
           BY:  WILLIAM MORRIS
 6         Assistant United States Attorneys
           United States Courthouse
 7         312 North Spring Street
           Los Angeles, California 90012
 8


 9    FOR THE DEFENDANT:

10         LEVINE FLIER & FLIER, LLP
           BY:  ANDREW FLIER
11         16133 Ventura Boulevard
           Suite 1140
12         Encino, California 91436

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**INDEX OF WITNESSES**

**WITNESSES**                                                          **PAGE**

BEVERLY, Dezmond

    Direct examination by Ms. Theriot                         11
    Cross-examination by Mr. Flier                            14
    Redirect examination by Ms. Theriot                       23

**INDEX OF EXHIBITS**

| NUMBER | DESCRIPTION | FOR IDENTIFICATION PG. | FOR EVIDENCE PG. |
|--------|-------------|------------------------|------------------|

(None.)

| | |
|---|---|
| 1 | **TUESDAY, MARCH 23, 2021; 5:46 P.M.** |
| 2 | **LOS ANGELES, CALIFORNIA** |
| 3 | -oOo- |
| 4 | |
| 5 | THE CLERK:  Calling case 21-1413-M, United States |
| 6 | of America versus Kentrell D. Gaulden. |
| 7 | Appearances, please. |
| 8 | MS. THERIOT:  Damare Theriot for the |
| 9 | United States. |
| 10 | MR. FLIER:  Thank you, Your Honor.  Attorney |
| 11 | Andrew Flier, F-l-i-e-r, on behalf of the defendant. |
| 12 | THE COURT:  I'm sorry.  Sir, your last name is |
| 13 | Andrew Flier? |
| 14 | MR. FLIER:  F-l-i-e-r, Flier, yes, Your Honor. |
| 15 | THE COURT:  And you are private counsel? |
| 16 | MR. FLIER:  Private counsel representing |
| 17 | Mr. Gaulden for the purpose of any matter in California, this |
| 18 | jurisdiction.  He has an attorney in Louisiana. |
| 19 | THE COURT:  Got it. |
| 20 | MR. FLIER:  Thank you. |
| 21 | THE COURT:  All right.  Thank you.  I didn't hear |
| 22 | how to pronounce your name, counsel, for the Government. |
| 23 | Theriot? |
| 24 | MS. THERIOT:  It's Theriot, Your Honor.  Thank |
| 25 | you. |

```
 1                    THE COURT:  Theriot.  Sorry about that.  Good
 2    afternoon, Ms. Theriot.  Good afternoon, Mr. Flier.  And good
 3    afternoon, Mr. Gaulden.
 4                    Do we have a need for -- no.  He is a U.S.
 5    citizen.
 6                    Sir, is your true and correct name
 7    Kentrell Gaulden?
 8                    THE DEFENDANT:  Yes, Your Honor.
 9                    THE COURT:  Okay.  Mr. Gaulden, I have here a
10    document that you waived your right to be present in court and
11    instead have elected to appear via video teleconference, and
12    it's been signed -- I can't tell if you -- did you sign this
13    document, sir?
14                    THE DEFENDANT:  Yes, Your Honor.
15                    THE COURT:  Before you signed this document, did
16    you have an opportunity to speak with your attorney regarding
17    what it means to waive that right, sir?
18                    THE DEFENDANT:  Yes, Your Honor.
19                    THE COURT:  And do you feel that you understand
20    what it means to waive that right?
21                    THE DEFENDANT:  Yes, Your Honor.
22                    THE COURT:  And with that understanding, do you
23    still wish to waive your right to appear in person in court?
24                    THE DEFENDANT:  Yes, Your Honor.
25                    THE COURT:  And, Mr. Flier, is this your
```

1    signature on the second page of this document indicating that

2    you concur with this waiver?

3                    MR. FLIER:  Yes, Your Honor.

4                    THE COURT:  Okay.  The Court finds the waiver to

5    be knowing and voluntary and accepts it as such.

6                    Mr. Gaulden, I have here a document entitled

7    Advisement of Defendant's Statutory and Constitutional Rights

8    which has been signed on the back.  Did you sign this document,

9    sir?

10                   THE DEFENDANT:  Yes, Your Honor.

11                   THE COURT:  And before you signed it, did you

12   have an opportunity to review its contents?

13                   THE DEFENDANT:  Yes, Your Honor.

14                   THE COURT:  And do you understand that it

15   contains a list of your statutory and constitutional rights?

16                   THE DEFENDANT:  Yes, Your Honor.

17                   THE COURT:  And do you understand those rights,

18   sir?

19                   THE DEFENDANT:  Yes, Your Honor.

20                   THE COURT:  Okay.  And, Mr. Flier, is this your

21   signature at the bottom indicating to the Court that you have

22   satisfied yourself your client understands his rights?

23                   MR. FLIER:  Yes, Your Honor.

24                   THE COURT:  All right.  Thank you.

25                   MR. FLIER:  You're welcome.

```
 1                THE COURT:  Okay.  So, Mr. Gaulden, the
 2   Government is proceeding against you by way of an Indictment.
 3   Have you had an opportunity to read that Indictment, sir?
 4                THE DEFENDANT:  Yes, Your Honor.
 5                THE COURT:  Without admitting or denying the
 6   allegations contained in the Indictment, do you understand the
 7   nature of the charges that are being brought against you, sir?
 8                THE DEFENDANT:  Yes, Your Honor.
 9                THE COURT:  Okay.  All right.  Well, let's
10   proceed then to a bond determination.
11                What is the Government's request, and what does
12   it proffer?
13                MS. THERIOT:  Your Honor, the Government seeks
14   detention and in support proffers the Indictment and the
15   pretrial report and its conclusion as to danger to the
16   community.
17                I would like to supplement the report as to risk
18   of flight, and Special Agent Beverly with the FBI is present in
19   the courtroom, or I can provide the Court additional
20   information about Mr. Gaulden's attempts to flee from arrest in
21   the instant matter.
22                THE COURT:  So your proffer is, in addition to
23   the Indictment and the pretrial services report on the
24   conclusion regarding danger, you want to -- you proffer FBI
25   testimony regarding danger -- risk of flight.
```

```
 1                    MS. THERIOT:  Yes, Your Honor.
 2                    THE COURT:  Okay.  Does the defendant accept that
 3    proffer?
 4                    MR. FLIER:  We accept the pretrial services
 5    report, Your Honor.  We do not accept the conclusion, and we
 6    definitely do not accept the supplemental information regarding
 7    flight.
 8                    I will submit on that.
 9                    THE COURT:  All right.  Is the FBI agent here?
10    Is that what you said?
11                    MR. FLIER:  He's in the back, Your Honor.
12                    THE COURT:  I see you.  Thank you, sir.
13                    Are you going to put him on -- Ms. Theriot, are
14    you putting him on?
15                    MS. THERIOT:  Well, Your Honor, the pretrial
16    report indicates that the defendant attempted to flee and hid
17    from officers.  In addition to that, I would proffer that a
18    loaded handgun was found in the car that the defendant fled in,
19    and he was the sole occupant of that car.  So I think that is
20    important information for the Court to take into consideration
21    in both risk of flight and danger to the community.
22                    THE COURT:  Right.  But is that in the report,
23    that last part about the handgun?
24                    MS. THERIOT:  It is not, Your Honor.
25                    THE COURT:  Okay.  So they're not accepting that
```

1    proffer.  Are you going to proceed without that proffer?  What

2    are you going to do?

3                    MS. THERIOT:  I will put the agent on to testify,

4    Your Honor.

5                    THE COURT:  Okay.  Why don't you make your

6    argument and then put the FBI agent on at the appropriate time.

7                    MS. THERIOT:  Your Honor, the Government is

8    seeking detention based on both danger to the community and

9    risk of flight.  Mr. Gaulden has a history of violence and a

10   history of using firearms.  We believe that he poses a danger

11   to the community regardless of any conditions the Court would

12   set.

13                   While he does have financial resources, he

14   attempted to flee in this instant case to avoid arrest, and we

15   have genuine concerns that he would be willing to travel back

16   to Louisiana to face the charges that he is facing here.

17                   For additional information that I think the Court

18   should hear about how Mr. Gaulden was actually taken into

19   custody, I would ask to put on Agent Beverly.

20                   THE COURT:  Okay.  Tell me the agent's name,

21   please.

22                   MS. THERIOT:  Dezmond, D-e-z-m-o-n-d, Beverly,

23   B-e-v-e-r-l-y.

24                   THE COURT:  All right.  Mr. Beverly, if you can

25   please come forward.

1          THE CLERK:  Please raise your right hand.

2          Do you solemnly swear to give true answers to the

3   questions before this Court, so help you God?

4          THE WITNESS:  Yes, sir.

5          THE CLERK:  Please have a seat.

6          Please state your name and spell your last name

7   for the record.

8          THE WITNESS:  Dezmond Beverly, last name

9   B-e-v-e-r-l-y.

10          THE CLERK:  Thank you.

11          THE COURT:  Counsel?

12          MS. THERIOT:  Thank you, Your Honor.

13                    **DEZMOND BEVERLY,**

14                **GOVERNMENT'S WITNESS, SWORN.**

15                   **DIRECT EXAMINATION**

16   BY MS. THERIOT:

17     Q      Agent Beverly, what is your occupation?

18     A      I'm a special agent with the FBI.

19     Q      And how long have you been a special agent with

20   the FBI?

21     A      Approximately nine months.

22     Q      And in your position as an agent with the FBI,

23   were you involved in the arrest of Mr. Gaulden yesterday in

24   Tarzana?

25     A      Yes, ma'am.

1    Q    And how did you come to be involved in that

2 arrest?

3    A    The FBI in Baton Rouge called for our assistance

4 because Mr. Gaulden was in our area in Los Angeles.  So they

5 called for additional assistance from Los Angeles FBI.  So we

6 were jointly to try and find Mr. Gaulden and try to arrest him.

7    Q    And did you locate him at a house on Amiga,

8 A-m-i-g-a, Avenue in the city of Tarzana?

9    A    Yes, ma'am.

10    Q    And were you present at that house yesterday?

11    A    Yes, ma'am.

12    Q    Were you present when marked patrol vehicles

13 attempted to stop Mr. Gaulden when he was driving in a

14 Mercedes?

15    A    Yes, ma'am.

16    Q    Can you tell us what happened when they attempted

17 to make that stop?

18    A    Once the marked police unit tried to make the

19 stop, Mr. Gaulden stopped the vehicle and began to flee from

20 marked units.

21    Q    Did he flee at first in the vehicle?

22    A    Yeah.  He fled at first in the vehicle and then

23 stopped.

24    Q    And while he was traveling in the vehicle, was he

25 driving safely or unsafely?

1    A    I didn't see him on the last part of the vehicle

2    chase.  In the beginning he was driving really fastly.

3            THE COURT:  I'm sorry.  Can you repeat that?  I

4    didn't understand he was driving what?

5            THE WITNESS:  Driving fast from the start.

6    Q    BY MS. THERIOT:  Was this a residential

7    neighborhood?

8    A    Yes, ma'am.

9    Q    And you said he stopped and he fled on foot?

10   A    Yes, ma'am.  When we approached the car, no one

11   was in the vehicle.

12   Q    Did you see anybody else get out of the vehicle?

13   A    No, ma'am.

14   Q    And did you see any weapons in the vehicle when

15   you approached it?

16   A    Yes, ma'am.  Behind the passenger seat.

17   Q    What did you see?

18   A    I seen a tan handgun.

19   Q    And was that handgun loaded?

20   A    Yes, ma'am.

21   Q    Did it appear to be operational to you?

22   A    Yes, ma'am.

23   Q    And when Mr. Gaulden fled, was he ultimately

24   apprehended?

25   A    Yes, ma'am.

1       Q       How did that happen?

2       A       We were getting the -- um, Tarzana Police was

3   able to call the dogs out, and the dogs were able to find him.

4       Q       Was there a helicopter involved in the search for

5   him?

6       A       Yes, ma'am.  A helicopter was in the perimeter as

7   well.

8       Q       And did Mr. Gaulden give himself up and walk over

9   to police, or did the dog have to find him?

10      A       That I do not know.

11      Q       You said the dogs were able to find him.  So what

12  do you know about that?

13      A       The officers told me that the dogs found him, but

14  I didn't see it myself with my own two eyes.

15              MR. FLIER:  Object.  It's conclusion and hearsay,

16  Your Honor, that last part.

17              THE COURT:  Sustained.

18              MS. THERIOT:  I have no further questions.

19              THE COURT:  Okay.  Mr. Flier.

20              MR. FLIER:  Thank you, Your Honor.

21                          **CROSS-EXAMINATION**

22  BY MR. FLIER:

23      Q       Agent Beverly, were you present when the vehicle

24  that my client was in was first spotted?

25      A       Yes, sir.

```
 1        Q        And what kind of vehicle were you in, please?

 2        A        I was in a blue Fusion.

 3        Q        So it's not a marked indicated police vehicle?

 4   It's an undercover vehicle to make it simple?

 5        A        Yes, sir.

 6        Q        And how many other vehicles were with you that

 7   were law enforcement at that time, if any?

 8        A        Approximately four.

 9        Q        And with respect to stopping the defendant, how

10   did that process happen?  Did one of the vehicles -- I assume

11   Los Angeles Police Department, did they activate their lights?

12        A        Yes, sir.

13        Q        And when the vehicle was first spotted that you

14   were aware of the vehicle, how did you know that the defendant

15   was inside it?

16        A        Because we had visual of the defendant -- we had

17   visual of him.

18        Q        Did you have visual of the defendant before he

19   entered the car?

20        A        No, sir.

21        Q        When you saw the defendant in the car, was it

22   more than one of the police vehicles activated their broadcast

23   lights?

24        A        No, sir.  It was one initially, and a second came

25   after that initial one.
```

1      Q       And once the lights were activated, how long
2  until the vehicle initially stopped?
3      A       I would say that Mr. Gaulden proceeded south on
4  Amigo and made a right turn -- I don't know the name of the
5  street but made a right turn, then made another right turn
6  under -- on fire -- I can't -- the name of the street starts
7  with an "F," made another right turn on that street, hit the
8  main street, and at that time that's when he stopped.  That's
9  when the vehicle stopped.
10      Q       Around two blocks?
11      A       Approximately two blocks city.  He fled.
12      Q       And did you observe that the vehicle that the
13  defendant was in, did it -- when you said it was going -- I
14  think it was driving fast, what does that mean in that
15  particular area?  Do you know what the zone limit is?
16      A       Zone limit in the area, 30, 30 miles an hour with
17  speed humps -- proper name, speed barriers.  Approximately
18  30 miles an hour.  He was definitely moving.
19      Q       When you say he was definitely moving, what was
20  your estimate about how fast that vehicle was traveling?  It
21  was around 30, 35 miles per hour; is that correct?
22      A       Approximately.  He was doing approximately 45,
23  50 miles an hour.
24      Q       And what was your distance approximately behind
25  that moving vehicle when you first observed it?

1      A       I wasn't facing the vehicle -- I was facing the

2  vehicle, and he was coming towards me.  So I was -- I had to

3  turn around to catch up with him.  The black and white was

4  right on his tail.

5      Q       In order for you to give an estimate of around

6  45 miles, maybe 50 miles per hour, you had to speed up your

7  particular vehicle to catch up to the patrol vehicles that were

8  behind the suspect vehicle; correct?

9      A       Correct.  But the position of my vehicle and the

10  position on the street that I was, I was approximately -- I was

11  approximately 70 yards away from the residence that Mr. Gaulden

12  was at.  So for him to acquire speed -- it normally gets up to

13  speed pretty quickly, pretty swiftly.  So I seen him gaining

14  speed as he came to me.

15      Q       You have no idea of the specific speed.  You are

16  just estimating; correct?

17      A       Correct.

18      Q       And you did have to -- did you have to commit or

19  do a U-turn in order to go in the same direction as the vehicle

20  in question?

21      A       Correct.

22      Q       So you did have to speed up your vehicle to catch

23  up to the suspect vehicle at some point in time.

24              Is that fair?

25      A       Right.

1    Q    And at any point in time, did you look at your

2    speedometer to see what speed your vehicle was traveling?

3    A    No, sir.

4    Q    Now, you just mentioned that there was a

5    particular house or residence that you believed the defendant

6    to either exit or come from, or was that just a guess?

7    A    Please repeat the question again, sir.

8    Q    Did you see the defendant ever leaving a

9    residence?

10    A    Yes, sir.

11    Q    And when he left the residence, did he run to his

12    vehicle, or did he walk normal?

13    A    It was norm -- he was in the garage.  So walked

14    through the house to the garage.  And as the garage came up,

15    that is when we seen him in the vehicle.

16    Q    When you saw my client or Mr. Gaulden -- excuse

17    me -- walking in any capacity, did you notice him carrying

18    anything in his hands?

19    A    No, sir.

20    Q    Did you notice him carrying a weapon in his

21    hands?

22    A    No, sir.

23    Q    The weapon that you saw or observed in the

24    vehicle, was that retained by law enforcement or yourself?

25    A    Yes, sir.

1          Q      Did you retain it?

2          A      No, sir.

3          Q      Now, when you observed the defendant,

4    Mr. Gaulden, walking in any capacity until he got to his car or

5    arrived at his car, you never saw anything in his hands that

6    resembled a firearm; correct?

7          A      No, sir.

8          Q      At any point in time, did the defendant reach, do

9    any furtive movements that attracted your attention that maybe

10   he was going for a weapon?  Because we heard none of that.

11         A      No, sir.

12         Q      Now, with respect to that weapon, and finally,

13   was there -- and even though this occurred I think you said

14   yesterday; correct?

15         A      Correct.

16         Q      Approximately what time?

17         A      Approximately 12 -- around 12:00 noon.

18         Q      If you know, was there any fingerprint analysis

19   conducted where we can come back and tell this Court right now

20   that the defendant's fingerprints were on that weapon?

21         A      No, sir.  Not at this time.

22         Q      At some point in time, you saw the defendant

23   and -- were you part of the apprehension specifically of

24   Mr. Gaulden?

25         A      No, sir.

1    Q    So you mentioned today -- and maybe I missed it.
2    But you said that you did not see the last part of when his
3    vehicle finally came to a stop; is that correct?
4    A    Correct.
5    Q    Is that because, once you were making a U-turn,
6    you were far enough behind where you did not see that?
7    A    Correct.
8    Q    So with respect to any observation of the speed
9    of the vehicle, you have no idea with respect to that indicated
10   part; correct?  You didn't see it?
11   A    I didn't see -- I didn't see the vehicle, but I
12   seen other cars in pursuit.
13   Q    So my question was you never saw that vehicle at
14   that point in time, the last part, I think your word was, of
15   the chase; is that correct?
16   A    The part of the -- yes, sir.
17   Q    Now -- so does that also mean that, when you
18   first observed -- I will just call it the suspect vehicle to
19   make everything easier -- you never saw Mr. Gaulden leave that
20   car.
21        Is that fair?
22   A    Yes, sir.
23   Q    At some point in time he surrendered; correct?
24   A    Yes, sir.
25   Q    He didn't fight with any dogs to the best of your

1    knowledge; is that correct?

2         A       No, sir.

3         Q       He did not receive any bite marks, did he?

4         A       No, sir.

5         Q       And he peacefully -- and whether I use the word

6    eventually or not, he surrendered; correct?

7         A       Yes, sir.

8                 MS. THERIOT:  Objection.  Calls for speculation.

9         Q       BY MR. FLIER:  Is it true in your presence law

10   enforcement had their guns exhibited out, displayed?

11        A       No, sir.

12        Q       At any point in time, did you see the police,

13   including yourself, with the FBI have their weapons out?

14        A       No, sir.

15        Q       Are you sure about that?

16        A       Positive.  I didn't see anything.

17        Q       At any point in time -- and I'm almost done,

18   Your Honor.

19                THE COURT:  That is fine.

20        Q       BY MR. FLIER:  At any point in time with respect

21   to -- and I asked a little earlier about furtive movements, in

22   your presence where you can make the observation, did you ever

23   see Mr. Gaulden reach behind him or touch the passenger seat in

24   an attempt to grab that weapon?

25        A       No, sir.

1       Q     Now, maybe I just didn't hear you correctly, and

2  I apologize.

3            Where was the gun located?

4       A     The gun was located on the floor behind the

5  passenger seat.

6       Q     Behind.  So in the backseat area of the vehicle.

7       A     Correct.

8       Q     You have no idea how that weapon was placed or

9  arrived in that particular area; is that correct?

10      A     No, sir.

11      Q     You have no idea if that weapon is even the

12  defendant's; correct?

13      A     Not at this time.

14      Q     With respect to the vehicle in question, do you

15  even know if that is the defendant's vehicle?

16      A     No, sir.

17      Q     You have no idea if that vehicle is the -- if the

18  defendant is the registered owner of that vehicle; correct?

19      A     No, sir.

20           MR. FLIER:  I have no further questions.

21           Thank you, sir, and thank you, Your Honor.

22           THE COURT:  You're welcome.

23           Do you have any redirect, counsel?

24           MS. THERIOT:  Yes, Your Honor.  Just very

25  briefly.

1          **REDIRECT EXAMINATION**

2     BY MS. THERIOT:

3          Q        Agent Beverly, you said that you saw the

4     defendant walk to the garage.  Did he have to come outside of

5     the house and then walk to the garage?

6          A        No, ma'am.  I didn't see that.

7          Q        Okay.  Well, Mr. Flier asked you if you saw him

8     walk to the car and if he had anything in his hand.  So did you

9     see him walk to the car?

10         A        No, sir.  No, ma'am.

11         Q        So the car was inside the garage?

12         A        Yes, ma'am.  The car was inside the garage, and

13    as we were calling out over coms, the officer that was able to

14    have eyes on it said that the garage is opening up and

15    defendant -- well, suspect is inside.  We don't know if -- as

16    he was pulling out, there was no tint on the windows.  So we

17    was able to identify him.

18         Q        Okay.  So when you said you didn't see anything

19    in his hands when he was walking to the car, did you actually

20    see his hands as he walked to the car?

21         A        No, ma'am.

22         Q        Did you see him walk to the car at all?

23         A        No, ma'am.

24         Q        Okay.  And you said that -- about how long time

25    passed between when this traffic stop was -- when the police

1    tried to initiate it and when Mr. Gaulden was actually taken

2    into custody?

3          A          Approximately -- from -- you said from when the

4    marked unit followed him to the stop to when we actually got

5    him in handcuffs; right?

6          Q          Correct.

7          A          Approximately -- it was between an hour and a

8    half to two hours.

9          Q          And how far away from that original house where

10   you saw him pull out in the vehicle was he originally located?

11         A          Two blocks.  Approximately two blocks.

12         Q          So two blocks away, but it took between one and

13   two hours for him to get placed into handcuffs; correct?

14         A          Yes, ma'am.

15         Q          And Mr. Flier used the word "surrendered."  Did

16   you see Mr. Gaulden surrender?

17         A          No, ma'am.

18                    MS. THERIOT:  Thank you.  I have nothing further.

19                    THE COURT:  Okay.  Anything else from the

20   Government as far as your argument for detention?

21                    MS. THERIOT:  Your Honor, just that we agree with

22   the pretrial services report as to danger to the community.  We

23   would supplement the fact that Mr. Gaulden was arrested with a

24   loaded gun in the vehicle that he was driving and that he is

25   both a danger to the community and a risk of flight and there

1   are no conditions that can secure his presence and the safety

2   of the community.

3                    THE COURT:  Okay.  Mr. Flier?

4                    MR. FLIER:  Thank you, Your Honor.

5                    THE COURT:  You're welcome.

6                    MR. FLIER:  With respect to Agent Beverly, with

7   all due respect to him, he seems like a nice man --

8                    THE COURT:  Are you done with him?

9                    MR. FLIER:  That's what I was -- thank you.

10                   THE COURT:  You may step down.  Thank you,

11  Agent Beverly.

12                   MR. FLIER:  He has the best seat in the house

13  besides Your Honor.

14                   Your Honor, I'm very concerned about a couple

15  issues, and normally I would not speak like that.  So I'm going

16  to start off like this.  Clearly -- this incident transpired,

17  why we're here today, because we have heard that LAPD, the

18  district attorney's office has not filed charges or had an

19  arrest warrant based on any weapon found in the car based on

20  yesterday.  So I want to start off with that.

21                   But, more importantly, this particular warrant

22  that was issued from Louisiana, the incident itself transpired

23  on September 28th.  In the pretrial services report, it

24  indicates on page 2 that the instant warrant was issued on

25  March 10.  So we have a six-month period.  So that is my first

```
 1   question that I had with my client.
 2              So what happened is on March -- on
 3   September 28th -- and I was able to procure the affidavit of
 4   probable cause regarding that particular incident, and here's
 5   what really troubles me.
 6              THE COURT:  Hold on.  Have you shared that with
 7   the other side?  Are you proffering that?  We're getting way --
 8              MR. FLIER:  Well --
 9              THE COURT:  I asked you what your proffer was,
10   and you didn't bring that in.
11              MR. FLIER:  I was waiting to argue because I
12   think it is a very material issue.  I received this just today
13   right before I left my house to come here.  I have been here
14   since 12:45.  And my point is this.  Normally I would not bring
15   it up, but it's very important to know two things about this
16   is, when we look at the Indictment --
17              THE COURT:  I'm going to stop you there for one
18   second.  I promise I will let you make your argument.  The
19   issue that I'm having is that you're bringing up something that
20   the other side appears to not have seen.
21              MR. FLIER:  Well, I would hope that the
22   Government lawyer has more information to be litigating this
23   issue.  So I assumed, maybe improperly -- I'm an ex-prosecutor,
24   so I assumed that the Government had the affidavit of probable
25   cause.  Maybe I was wrong to assume that.
```

1          THE COURT:  I just want to make sure.

2          MR. FLIER:  Okay.

3          THE COURT:  So, Ms. Theriot, have you seen this

4    document?  Do you accept this proffer?  What are we doing with

5    this document?

6          MS. THERIOT:  Your Honor, I don't have it in

7    front of me right now, but I can get it, and Mr. Flier can

8    continue.

9          THE COURT:  Do you accept the proffer and he can

10   move on?

11         MS. THERIOT:  I do.

12         THE COURT:  All right.  Thank you.  Thank you

13   very much.

14         And, Mr. Flier, I apologize for interrupting you.

15   Please continue.

16         MR. FLIER:  No problem.  And I apologize for my

17   assumption.

18         So here's what concerned me about everything,

19   Your Honor.  And, you know, when I first looked at the

20   affidavit earlier, I didn't really think much about it except I

21   thought this might be a defensible case -- but I'm going to

22   move on from that -- is this, when we look at Count 1 of the

23   Indictment, it says -- it mentioned, as it does in Count 3, the

24   two particular weapons.  It mentions that there was a

25   .45 caliber pistol and it bears the serial number AETT723.

1  Then it mentions as the second weapon the 9mm.  FX14873 is the

2  serial number.

3           And here is the issue.  When you look at the

4  affidavit, Your Honor, it says that, as to the AETT723

5  .45 caliber, it's mentioned in the affidavit that a Mr. Ramsey,

6  R-a-m-s-e-y, for the record, he was advised of his rights

7  orally per Miranda and Ramsey informed him that he had a

8  Glock 21 .45 caliber handgun on his person.  I don't see any

9  conspiracy charge here.  So unless there is direct evidence to

10  show aiding and abetting or a conspiracy, that particular

11  weapon is on the person of somebody else, and that concerned

12  me.

13           Then I kept on reading once I saw that issue.

14  The second weapon mentioned, that was found in a 2006 Acura

15  SUV, and it was located in the vehicle, and it actually

16  mentions that serial number specifically.  There is absolutely

17  no connection between these two firearms and the defendant,

18  period.  And that's why I thought it was very important and

19  material to bring this up, and I don't see how the Government

20  can argue anything but what the affidavit says.

21           So I'm not here to make a Motion to Dismiss the

22  Indictment.  That's not in my purview right now and --

23           THE COURT:  It's not mine either.

24           MR. FLIER:  That's why I say it this way,

25  Your Honor.  I'm just bringing it up to go to the two material

 1 | issues before us right now.

 2 |        Number one is, besides what I mentioned, in the

 3 | pretrial services report, it mentions -- and I think this is

 4 | why we had to hear from the agent today because the Government

 5 | proffered they were going to add supplemental information and

 6 | that was Agent Beverly's testimony.  But with respect to the

 7 | conclusions from pretrial service -- and I just want to get to

 8 | that again, please, and it's on page 6 as the Court recognizes.

 9 | Pretrial services believes a financial bond and conditions of

10 | release can be set to mitigate concerns for nonappearance.

11 |        So I do not believe -- and I agree with pretrial

12 | service -- that there is no flight issue.  More importantly --

13 | and maybe I should have asked the agent.  My client is a very

14 | successful and well-known rapper.  He bought a house in Utah

15 | that is paid off and, as mentioned in the pretrial service,

16 | report -- and that's on page 2, Your Honor.  And that

17 | particular residence I believe, when I spoke to the defendant,

18 | cost around $500,000 and is paid off.  So we have $500,000 of

19 | equity.

20 |        In addition, I didn't stop there.  I talked to

21 | the defendant, and he told me he also owns a house in

22 | Houston, Texas that is worth approximately $1.2 million.  That

23 | house also has been paid off.  So he has equity of at least

24 | $1.7 million, and that's -- and I believe there goes the flight

25 | issue.

1          But also and lastly about that, he is a

2    well-known, recognized rapper and a very successful one.  Where

3    is he going to go?  He has no passport, and as at least alluded

4    to in the pretrial services report, he has never been out of

5    the country.  So I don't think flight is at all an issue.

6          Now, I understand we just heard testimony, but

7    the defendant was scared when the police out of nowhere

8    suddenly activate their lights when he has not committed

9    initially any moving violations, any traffic violations.  So he

10   didn't know what was going on.  And remember, this arrest

11   initially was September 28th.  He bonded out around $20,000,

12   and there was absolutely no issue, because he has his lawyer,

13   that there was an arrest warrant, there was notification in the

14   mail.  He had no idea this case was even going to be an

15   Indictment or before this Court.  So that is what spooked him

16   if that is the proper term.

17          He did not display the weapon.  He did not

18   discharge the weapon.  He did not hurt the dogs.  He did not

19   hurt any law enforcement.  And thankfully, of course, he didn't

20   hurt Agent Beverly.  So I'm going to move on, and I'm going to

21   get to the dangerous issue.  And that was the reason why,

22   Your Honor, that I mentioned the affidavit.

23          He is charged with two counts that deal with two

24   firearms that I think can be affirmatively proven were not his.

25   Not only were they not his, they're not in his possession.  And

1 that is critical in this evaluation about dangerousness

2 because, once we get through that issue, we're left with only

3 one more issue, his prior criminal history. And I'd like to

4 mention that, please.

5          If we look at pretrial service, you know, it's a

6 page and a quarter. But if you look at the dispositions, the

7 last three on page 4 have no disposition. And the first one --

8 and I'm not here to minimize any criminal conduct. The first

9 one, the family violence one that says a simple battery, that

10 was a misdemeanor. He served 12 months of summary type

11 probation. He never violated, and that was in 2019. And there

12 was never any information that he violated any protective order

13 or restraining order.

14          I'd like to move on now to what I consider the

15 main one, his aggravated assault with a firearm. It's the

16 defendant's position -- I was not his attorney of record

17 because, as the Court indicates, that was in Baton Rouge --

18 that case he did some time in custody, minimal time in custody.

19 He never violated probation. He never had any failure to

20 appear. He never violated any supervised release. And he

21 believes -- and this is the part that I'm just offering because

22 I don't know specifically -- that once that case was over, it

23 was reduced to a misdemeanor. So he has in his mind two

24 misdemeanors. And, again, I'm not minimizing any criminal

25 conduct even if this was a trespass.

1          If we look at the pretrial service issue, if we
2    really lock it down, I think I really mentioned why we're
3    having an issue with any type of detention based on safety to
4    the community because, even if you assume these two firearms
5    are even involved with the defendant, there is no evidence that
6    it was discharged, displayed, and it's actually my information
7    and belief that they were doing a rap video at the time.  That
8    doesn't mean they should have live weapons.  I'm not even sure
9    if it was.  I think that's where you should have toy guns, but
10   maybe I have too many children.

11          At the same time, my real point is there is no
12   evidence that connects the defendant, at least my understanding
13   based on the affidavit, as to those two firearms which is the
14   predicate of this Indictment.  So I'm very concerned about
15   that.

16          He will -- he being the defendant -- will comply
17   with any terms and conditions.  I spoke to him about that.  He
18   has a residence in Utah.  He has known people in Louisiana, his
19   grandfather.  And as the pretrial services report indicates, he
20   has his mother who is mentioned in Texas where he also owns the
21   house.  He will comply with anything.

22          And interesting to note -- and I'm almost done,
23   Your Honor -- is the first thing that he said to me when I saw
24   him was I never received any notice.  I never not complied with
25   any court appearance.  And I will do whatever the Court wishes

1  with respect to any conditions.

2          So I believe -- and he is a United States

3  citizen, of course.  Also in the audience is his sister and his

4  girlfriend who is actually mentioned -- I think it's

5  Ms. Star -- in the pretrial services report.

6          So I just -- I just think that, when you have

7  someone that is in the rap entertainment business, that doesn't

8  mean he gets a pass for anything.  Of course not.  But when you

9  have someone that's in that industry -- the reason why I bring

10  it up, he is very well-known.  He's not going to go anywhere.

11  That's what he does.  He makes music, he makes music videos,

12  and he's very successful.  He's not going to leave the

13  United States.  He will comply with any term and condition.

14          So I think that we have clearly shown that there

15  are conditions and a combination of conditions that will not

16  only assure his appearance anywhere but also that he's not a

17  danger to the community.  He will go on electronic monitoring.

18  He will go on location devices.  He will do whatever the Court

19  wishes because, not only is he successful, as we also saw in

20  this report, he has seven children.  So he doesn't want to be

21  away from seven children where they're left I don't want to say

22  homeless and be too dramatic, of course --

23          THE COURT:  He doesn't live with them, does he?

24  He said he doesn't live with, like, six of them.

25          MR. FLIER:  No, he does not.  I know he lives

1  right now with Ms. Star, and I know one of the babies is in the

2  courtroom right now.  I think he's four years old.

3           So I just think that in this case he will even --

4  even if the Court says right now I'm going to release you

5  because Mr. Flier was so good in his argument -- why did you

6  laugh on that one?

7           THE COURT:  I just thought that was a clever

8  thing to throw in.  Go ahead.

9           MR. FLIER:  Thank you.  My real point there is he

10  has the financial ability to go back to Louisiana and face

11  charges.  He also has a lawyer there already who was his lawyer

12  on one of the prior occasions.  My law firm, my partner

13  Mr. Leonard Levine, he couldn't be here today because he had

14  shoulder surgery, but he's been in direct communication with

15  the lawyer in Louisiana.  I just think that we have shown not

16  only factually but based on the history and background of the

17  defendant that there is definitely conditions and combination

18  of conditions to assure not only his appearances but also

19  safety to the community.

20           And if there's any other issue that the Court

21  would like me to address, I'm here to do that.  And I will

22  submit.  Thank you.

23           THE COURT:  Okay.  Thank you, Mr. Flier.

24           I do have a question.  What exactly are you

25  proposing in terms of a bond?

```
 1              MR. FLIER:  I'm proposing two things.  Number one
 2   is, as it's indicated in the pretrial services report, that his
 3   mother will -- an unjustified appearance bond, a signature
 4   bond, whatever bond we want to call it.  So we have his mother
 5   Ms. Coleman.  We also have Ms. Star who is willing to do the
 6   same thing, and she's in the courtroom.  But also, based on --
 7   after I read this pretrial services report, because I didn't
 8   receive it, Your Honor, until a little later, that the
 9   defendant, he has all this equity.  So he will even do a
10   property bond.  No one wants to lose a house whether it's in
11   Utah or Texas or both.
12              But he will do everything that the Court wishes
13   about any type of assurance bond, non-assurance bond.  We have
14   two people at least to do the non-assurance one.  We have him
15   to do a property bond if that is what it takes.  He has the
16   assets, Your Honor.  Of course, with all the children he has --
17   and I don't want to minimize that in any way -- obviously, to
18   lose two houses and that type of equity would be a financial
19   distress.
20              But, lastly, if we look at page 3, it mentions
21   that the defendant reported having two bank accounts; however,
22   he was not sure of the balance.  He estimates having at least
23   seven figures.  Not many people in our community have seven
24   figures in a bank account.  So I think he has ample financial
25   means -- property bond, finances in the bank, his family.  And
```

1    everybody supports him.  And I believe that, besides that,

2    ankle monitoring.  Of course an order from the Court to say he

3    cannot be near or around any firearms.

4              I think that will justify to have the defendant

5    released, and he will comply with any terms and conditions.

6    Plus I told him -- and I heard in the court today at least six

7    times -- that, if he violates any of these terms and

8    conditions, he will have, whether I want to use the word wrath,

9    but he will have the discipline issue from Your Honor to revoke

10   any of this, lose his bond, everything.  And he understands

11   that because I spoke to him about that.

12             Submitted.

13             MS. THERIOT:  Your Honor, may be I heard?

14             THE COURT:  I will go back to the Government.

15   All sorts of stuff was added here that were proffers, and I

16   don't even know if the Government accepts.

17             MS. THERIOT:  So, Your Honor, Mr. Flier

18   referenced information in the affidavit, and he allowed the

19   Court to have a picture of the case that is, frankly, quite

20   inaccurate.

21             Apparently Mr. Flier does know that a rap video

22   was being filmed at the time of the September 28 arrest.  The

23   location of the guns, as described in the affidavits, is where

24   they were found by police.  However, the Government has

25   extremely high quality video, because there was a rap video

1    being filmed, of the defendant in personal possession of both

2    of these handguns.

3            I would be happy to provide the Court and counsel

4    with still images from those videos at any time, but to say

5    that the guns were never in the possession -- personal

6    possession of Mr. Gaulden is quite simply inaccurate.  I know

7    Mr. Flier doesn't have the benefit of having discovery in this

8    case, but it's simply not true that Mr. Gaulden didn't have

9    both of those guns on his person.  He, in fact, did.  The guns

10   were not only real guns.  They were loaded guns at the time of

11   their recovery.

12           And while it is absolutely clear that Mr. Gaulden

13   does have a significant amount of money, there is no amount of

14   money that can create safety for the community.  That is why

15   pretrial services didn't recommend release based on danger to

16   the community.

17           It is also inaccurate that his charges for

18   aggravated assault were reduced to misdemeanors.  That is just

19   simply not true.  They are still felonies, and they are the

20   felonies that underlie Mr. Gaulden's Indictment in the present

21   case for felon in possession.

22           So I think those are two major pieces that

23   Mr. Flier offered the Court that he would argue cut in terms of

24   his client not being a safety risk, and they're just simply

25   inaccurate.

```
 1                THE DEFENDANT:  Excuse me?

 2                THE COURT:  All right.

 3                MR. FLIER:  Your Honor, may I just briefly

 4   respond?

 5                THE COURT:  Really briefly.

 6                MR. FLIER:  It will be very brief.  First of

 7   all --

 8                THE DEFENDANT:  May I speak?

 9                MR. FLIER:  No.  Please do not.

10                THE COURT:  Let me just say, Mr. Gaulden, it is

11   probably not a good idea for you to speak unless your attorney

12   wants you to speak.

13                THE DEFENDANT:  Yes, Your Honor.

14                THE COURT:  So before you say anything, please

15   ask your attorney if you can speak.

16                THE DEFENDANT:  Yes, Your Honor.

17                MR. FLIER:  I recommend you don't speak, sir.

18   Thank you.  Do you understand that?

19                THE DEFENDANT:  Yes, sir.

20                MR. FLIER:  Okay.  Your Honor, I just wanted to

21   briefly respond.  Correct, I don't have any video stills.  I

22   don't have any video.  My point in the affidavit, of course, is

23   never to mislead.

24                My point is we have evidence in this affidavit

25   that shows those aren't his guns.  The fact that we might have
```

1   a video that shows him holding the gun is quite different, not

2   minimizing it.  Second, the fact that, in the defendant's

3   belief the case of that other felony was reduced, I understand

4   the charges very clearly about ex-cons or felons with a gun.

5   So I understood that.  My point was, if a defendant believes

6   that the case was reduced to a misdemeanor, later on maybe a

7   triable issue, that can become relevant, especially if he has

8   witnesses or evidence to support it.  That's why I brought up

9   those issues.

10              I want to be crystal clear.  I didn't see the

11  video.  But there is a huge difference when there is an

12  affidavit that is sworn and somebody has it on him, the first

13  weapon, and the second one is already in a vehicle, in the back

14  area of the vehicle -- of a car that's not tied to the

15  defendant.

16              So I just wanted to respond on those two turns

17  because I truly believe in this case that there are reasonable

18  assurances both to flight and safety community issues.  Thank

19  you.

20              THE COURT:  Okay.  And one final -- thank you,

21  Mr. Flier.

22              And one final question for the Government.  Have

23  you been in contact with your counterpart in Louisiana?

24              MS. THERIOT:  Yes.  He's actually sitting in the

25  room with me right now, Your Honor.

```
 1                  THE COURT:  He's in the room with you here in
 2    L.A.?
 3                  MS. THERIOT:  My counterpart -- sorry.  You meant
 4    defense counsel or you meant the U.S. Attorney?
 5                  THE COURT:  Your counterpart, the Government in
 6    Louisiana.
 7                  MS. THERIOT:  Yes.  United States Attorney on the
 8    case in Louisiana is sitting here with me.
 9                  THE COURT:  What is the desire of the Louisiana
10    U.S. Attorney?
11                  MR. MORRIS:  Your Honor, we share the position of
12    Ms. Theriot as co-counsel, as attorney for the organized crime
13    and gang section.  It's our position that the defendant should
14    be detained based on danger to the community and risk of
15    flight.  And we join in the motion made by counsel.
16                  And for the record, my name is Will Morris,
17    William J. Morris, Assistant United States Attorney.
18                  THE COURT:  All right.  So here's, Mr. Morris --
19    whatever I do, you folks are going to undo in Louisiana if I
20    release him.  So here is what I am going to do.
21                  I am persuaded that there are conditions that
22    could mitigate the danger to the community and the risk of
23    flight because there is an incredible amount of bond available
24    here and a lot to lose for several people should Mr. Gaulden
25    abscond.  And I am -- and pretrial services seems to not be too
```

1    concerned with risk of flight and believes it can be mitigated.

2              The issue to the danger to the community, you

3    know, is a little bit iffy in my mind because all sorts of new

4    information has been brought in.

5              That said, what I think I am going to do is I am

6    going to release him but stay my order to give you, Mr. Morris,

7    an opportunity to do whatever you are going to do in Louisiana

8    to overrule -- to have a district judge there overrule me.

9              How long, Mr. Morris -- how quickly can you do

10    this if you're going to, which I assume you are?

11              MR. MORRIS:  Your Honor, are you -- just to make

12    it clear, the petitioning of the magistrate judge here, would

13    that be after Mr. Gaulden is physically transported to

14    Louisiana and have a hearing down here?

15              THE COURT:  Well, he has waived an identity

16    hearing.  I notice he hasn't waived arrival of process.  Did

17    you intend to just waive identity but not arrival of process,

18    Mr. Flier?

19              MR. FLIER:  We will waive the process issue.  And

20    there was another issue, Your Honor, I was thinking about is,

21    you know, I never see a preliminary hearing, but I just saw the

22    case right before there was one ordered.  We will waive at

23    least for these preliminary purposes any rights about a

24    preliminary hearing too.

25              THE COURT:  So you're waiving everything?

```
 1                    MR. FLIER:  Yes.

 2                    THE COURT:  Okay.  Well, that means he will be

 3     transported forthwith if I -- well, no.  Let's see.  I actually

 4     don't know how that would work.  It would seem to me that he

 5     would not -- it wouldn't make sense to have him -- to send him

 6     to Louisiana.  I think I would detain him here.  I think I can

 7     do that.  Help me out if you think I can't.  But I think I can

 8     detain him here and give you two days, Mr. Morris, to go do

 9     whatever you're going to do in Louisiana.

10                    If you can overrule me, if you intend to have my

11     decision overruled by the district judge in Louisiana, then so

12     be it.  But in the meantime, he stays here on a stay.  If I'm

13     not overruled in two days, he's released pending, of course --

14     maybe I shouldn't make it so -- I don't know if that will work

15     because I'm going to order him to put up both of his houses.

16     So how quickly is he going to do that?  And I'm going to order

17     other people to sign bonds, surety affidavits.  How quickly --

18     and he's not going to be released until all of that is posted.

19     Maybe that's not going to be an issue then for Louisiana.  I

20     don't know how quickly you can get those bonds done.

21                    MR. FLIER:  May I respond?

22                    THE COURT:  Yes, please.

23                    MR. FLIER:  That is an interesting point because

24     I was just thinking that too is I appreciate the release but

25     staying the order for two days.  I don't want that to be
```

1   abrogated, but if it is, it is, by how long it takes for us to

2   do all of the formalities as to both properties and the two

3   individuals regarding the surety issues.

4           The two individuals -- we have one here.  That is

5   quick.  And his mother, I assume, can be contacted later on

6   today, and that can probably be done by tomorrow.  The property

7   bond issue is different.  I have no idea about where the

8   properties are, but I know that we can retain an expert in that

9   field that can take care of that for the defense.  So I will

10  work with his Louisiana lawyer.

11          Here is my real point.  I understand exactly what

12  the Court is saying.  I really do.  My real concern -- and I'm

13  in no way saying this to be disingenuous.  That would never be

14  my style.  It probably -- not probably.  It definitely will

15  take more than a couple days to do the property bond issue, and

16  I don't want the Government to have more time with a district

17  court.  I think the two days issue, especially if you're the

18  defendant in custody with COVID around -- and I didn't want to

19  bring up COVID.  I just had my second shot, so I was happy

20  about that myself.

21          But the bottom line is I understand, and we're

22  going to comply with whatever the Court wishes.  But would the

23  Court consider releasing him in two days if and only if the

24  Louisiana jurisdiction does not have a district judge overturn

25  the Court's ruling which I think is based on facts.  So I don't

1  see how that's going to happen.  Maybe I'm just wishful

2  thinking for the defense.  That would be my request because I

3  think it's a little unfair, not too unfair -- I want to be very

4  clear -- that the Government might be able to -- I don't want

5  to say buy more time, but we're going to really have to work on

6  this issue diligently, and I know that takes time.  I know I

7  will have the Louisiana lawyer, I will have my law firm.  I

8  know I have a busy schedule, especially tomorrow, Thursday, and

9  Friday.  I mean it just happens to be that way.  But we will do

10 what's in the best interests of the defendant.  That is always

11 our priority.

12            THE COURT:  Well, let me ask you this.  I caught

13 myself thinking out loud, and I apologize because I really was

14 thinking in a way that just doesn't make sense with respect to

15 the two days for Louisiana to do what it's going to do since I

16 don't intend to release your client until the property is

17 deeded.

18            So the Government is going to have however long

19 it's going to have until the property is deeded.  If you want

20 to offer something else in the interim until he can deed the

21 property and then that's replaced but -- whatever you offer is

22 replaced by the deeds on the property, maybe.  But that's about

23 as far as -- I mean, he's got the seven figures, as you said.

24            THE DEFENDANT:  Excuse me, Your Honor.

25            MR. FLIER:  We're thinking out loud here.  I

1    don't know whether it's good or bad on your part.  I know it's

2    good on mine.

3                What I was thinking about that issue, I think

4    that would take a power of attorney maybe, and I think we can

5    do that.  I had a notary come today for another issue with the

6    defendant.  I know I can get a notary whenever I want because I

7    know the notary.  I think we're going to have to do a power of

8    attorney.

9                So what I would suggest is that he put in some

10   type of, I don't know, any type of word we want to use even if

11   it's in our trust account, even if it's in our law firm trust

12   account, that we can put up probably around 200-, $250,000 only

13   for the release issue and at the same time trying to secure the

14   property bond issues.  I'm seeing a little --

15                THE COURT:  I --

16                MR. FLIER:  I'm just trying to be creative.

17                THE COURT:  I know, and that's fine.  I just

18   don't think that's enough.  If I'm going to hold him for

19   1.7 million in deeding of property according to what he owns,

20   then $250,000 is not going to hold it.  You know what I mean?

21                THE DEFENDANT:  Excuse me?

22                MR. FLIER:  Because I don't know what he has in

23   the bank accounts.  If we do believe it's seven figures, then

24   what about 500,000?  How is that not a motivation at its

25   greatest?  I mean, that's a lot of money.  And if he doesn't

```
 1  have it, then he doesn't have it, and we are still going to
 2  work on the property bond.
 3                  MS. THERIOT:  Your Honor, this is starting to --
 4                  THE COURT:  You told me he had it.
 5                  MR. FLIER:  I'm saying with respect to us
 6  procuring it within two days is what I meant.
 7                  THE COURT:  Okay.  One final word, and then
 8  that's it because I've got to -- we have to move this along.
 9                  MS. THERIOT:  One final word from the Government?
10                  THE COURT:  Ms. Theriot, were you going to say
11  something?
12                  MS. THERIOT:  Yes, Your Honor.  I was just saying
13  that Mr. Flier was starting to sound like he was negotiating
14  for a used car, and I would just ask the Court to impose the
15  original conditions that Your Honor indicated and that we will
16  be appealing and we appreciate you staying your order in the
17  meantime.
18                  MR. FLIER:  I would just like to briefly respond
19  about the used car issue.
20                  THE COURT:  No.  No.  No.  Because here's the
21  thing, until all of this is posted, the Government can do
22  whatever it's going to do in any event.  And even after all of
23  it is posted, the Government can do whatever it's going to do,
24  and the district judge in Louisiana can overturn whatever I
25  have done.  So I don't know what we gain from that.
```

1              Here is what I'm thinking.  He's going -- okay.

2    The mother, how much of a bond are you suggesting from the

3    mother?  I think I heard 20-.

4              MR. FLIER:  Yes, Your Honor.  That was mentioned

5    at -- I saw that.

6              THE COURT:  Okay.  The girlfriend?

7              MR. FLIER:  I would ask that, as to the

8    girlfriend and the mother, it would be at a lower level, maybe

9    20- to 30,000 as to each.

10             THE COURT:  20,000 each?  Is that what you're

11   saying?

12             MR. FLIER:  Yes, Your Honor.

13             THE COURT:  Okay.  1.5 million in equity through

14   two houses.  I understand he has 1.7; is that correct?

15             MR. FLIER:  That is my understanding.  That was

16   based on the conversation with the client himself.  So let's

17   hope he was accurate on that.

18             THE COURT:  And then he has cash.  How about we

19   have him deposit cash in your trust account?

20             MR. FLIER:  That is fine.  It will all be

21   verified and documented.

22             THE COURT:  Yeah.  Yeah.  The cash bond of

23   $500,000 to be deposited in the trust account -- what is the

24   name of your firm?

25             MR. FLIER:  Levine, L-e-v-i-n-e, Flier & Flier,

```
 1   F-l-i-e-r.
 2              THE COURT:  Which of the Fliers are you?
 3              MR. FLIER:  I am -- I practiced for 20 years with
 4   my father, but he passed away.
 5              THE COURT:  I'm so sorry.  Okay.  All right.
 6              MR. FLIER:  I was always going to keep his name
 7   as part of the firm.
 8              THE COURT:  Okay.  So he will be released on a
 9   bail as indicated -- as we have discussed upon posting of the
10   two surety affidavits and a declaration from you, Mr. Flier,
11   regarding the posting of the cash bond in your trust account.
12              Okay.  Are there any passports?
13              MR. FLIER:  He has no passport, Your Honor.
14              THE COURT:  No passport?
15              MR. FLIER:  Correct.
16              THE COURT:  Okay.  So a declaration of passport
17   by tomorrow.
18              Travel restricted to the Central District of --
19   wait.  Does he live here?
20              THE DEFENDANT:  I have a home here.
21              MR. FLIER:  He does come back and forth,
22   especially for business, Your Honor.  That is my only
23   understanding.  I'm now hearing of maybe a third home.  So I
24   would request that the three jurisdictions be the
25   Central District of California -- well, four, Utah, Texas, and
```

```
 1   Louisiana.
 2                THE COURT:  Which district in Texas?
 3                MR. FLIER:  I don't know that answer.
 4                THE COURT:  Does Louisiana have more than one
 5   district?
 6                MR. FLIER:  I believe they do because I saw in
 7   one of the moving papers that this was in the 19th Judicial
 8   District Court.
 9                THE COURT:  I saw that.  I don't know what that
10   means.
11                MR. FLIER:  I can check into that information, of
12   course.
13                THE COURT:  Okay.  Can you provide us with that
14   information tomorrow?
15                MR. FLIER:  Yes, Your Honor.
16                THE COURT:  Okay.  Reside as approved by pretrial
17   services -- okay.
18                So, Mr. Gaulden, I'm going to go through some
19   conditions of your release.  I want you to pay attention,
20   please, because at the end I'm going to -- it's not a test, but
21   I want to make sure you understand.  Okay?
22                THE DEFENDANT:  Yes.
23                THE COURT:  So if you don't understand something
24   as I'm saying it, please let your attorney know.
25                So you would be released on a bond that will be
```

1  an appearance bond in the amount of $40,000 -- 20,000 affidavit

2  of surety from your mother, 20,000 from your girlfriend.  You

3  will post a cash bond of $500,000.  So you're posting $500,000

4  into the trust account of Levine Flier & Flier which will be

5  released back to you upon the posting with this Court of an

6  affidavit with justification of surety in the amount of

7  $1.5 million which will be based on equity in your homes.  I

8  didn't know there was a third home.  If you want to divide it

9  up, that's fine as well, but at least two homes.  Okay?

10              You are going to be supervised by pretrial

11  services.

12              You're going to provide the Court with a

13  declaration of passport and other travel documents by tomorrow

14  and not apply for a passport or other travel documents during

15  the pendency of this case.

16              Your travel is restricted to four districts in

17  the country.  One of them is the Central District of

18  California, another one will be in Utah, another one will be in

19  Texas, and another one will be in Louisiana.  And your counsel

20  is going to provide us with that information so we can put it

21  in the order tomorrow.

22              You're going to reside as approved by pretrial

23  services and not relocate without prior permission from

24  pretrial services.

25              You're going to maintain or actively seek

1   employment and provide proof to pretrial services, and your

2   employment must be pre-approved by pretrial services.

3            You're to avoid all contact directly or

4   indirectly including by electronic means, that means no

5   texting, no posting, no nothing to communicate with any person

6   who is a known victim or witness in the subject investigation

7   or prosecution.

8            You are to avoid all contact directly or

9   indirectly including by electronic means with any known

10  co-defendants except in the presence of counsel.

11           You are not to possess any firearms, ammunition,

12  destructive device, or other dangerous weapons.  In order to

13  determine compliance, you agree to submit to a search of your

14  person and/or property by pretrial services in conjunction with

15  the U.S. Marshal.

16           Does the Government have any concerns about

17  alcohol or drugs?  I think there was an issue about substance

18  abuse; right?

19           MS. THERIOT:  Daily marijuana use is indicated in

20  pretrial services report, Your Honor.

21           THE COURT:  So you don't have any concerns about

22  alcohol?

23           MS. THERIOT:  Not based on any information I

24  have, Your Honor.

25           THE COURT:  Okay.  You're not to use or possess

 1    illegal drugs or state-authorized marijuana.  In order to

 2    determine compliance, you agree to submit to a search of your

 3    person and/or property by pretrial services in conjunction with

 4    the U.S. Marshal;

 5             You're not to use for purposes of intoxication

 6    any controlled substance analogue as defined by federal law or

 7    street synthetic or designer psychoactive substance capable of

 8    impairing mental or physical functioning more than minimally

 9    except as prescribed by a medical doctor;

10             You are to submit to drug testing if directed to

11    do so, participate in an outpatient treatment as approved by

12    pretrial services.  You must pay all or part of the cost for

13    testing and treatment based upon your ability to pay as

14    determined by pretrial services;

15             You're to participate in location monitoring and

16    abide by all requirements of the program under the direction of

17    pretrial services which will include a location monitoring

18    bracelet.  You must pay all or part of the cost of the program

19    based upon your ability to pay as determined by pretrial

20    services.  You must be financially responsible for any lost or

21    damaged equipment.

22             Does the Government have any concerns about doing

23    this without residential restrictions?  I just have a concern

24    about how that's going to be -- how residential restrictions

25    are even going to be monitored by pretrial services.

1    MS. THERIOT:  Yes, Your Honor.  We do have a
2  concern.  Allowing him to travel to four different houses seems
3  unnecessary.  We would ask that he just be either in the
4  Central District of California or in the middle district of
5  Los Angeles.  And if, in fact, he is released, the Court does
6  need to order him here to the middle district of Los Angeles
7  because he needs to come and appear in this case.
8    THE COURT:  Yeah.  Thank you.  But that wasn't my
9  question.  Sorry that I wasn't clear.
10    My concern is how do we restrict him to his
11  residence?  Are we going to ping-pong this from one pretrial
12  services to the other?  Is pretrial services on the line still?
13    PRETRIAL SERVICES OFFICER:  Yes, Your Honor.
14    THE COURT:  How do we do this?  How is this done?
15    PRETRIAL SERVICES OFFICER:  So it really depends
16  on how much you want to restrict him, Your Honor.  If you
17  choose the no residential restrictions, then he essentially
18  would not have a curfew or any time that he has to be home.  If
19  you selected the restricted tier residence every day and added
20  a curfew for set times.  And the last option is home detention.
21    As far as the district that he is in, you can put
22  something in the order that it be determined based on the
23  district that he is in because some districts do vary on the
24  equipment that they use.  No residential restriction option
25  that we have, not every district has that option.  Most

1  districts essentially have curfew or home detention.

2           THE COURT:  Yeah.  I'm still not clear on -- do

3  you ping-pong him back and forth between pretrial services?

4  That is my question.  How does this work?  And is it even

5  workable?

6           PRETRIAL SERVICES OFFICER:  I'm sorry,

7  Your Honor.  I'm not sure the question that you are asking.

8  Are you asking which district he is going to be supervised by

9  with location monitoring?

10           THE COURT:  If I do residential restriction, how

11  is that supervision going to happen when he's allowed to go to

12  four districts?  Is that going to be a problem?  If you're

13  telling me that it's not going to be a problem, that's fine.  I

14  just need to -- I just can't envision it; so I'm just asking.

15           PRETRIAL SERVICES OFFICER:  So you did order to

16  reside as approved by pretrial services, so he would have to

17  advise pretrial the residence he would be staying at daily.

18  Depending on what district he is in, that is who would be

19  monitoring him through location monitoring.  If you did want to

20  mostly restrict him to one district, you could specify in the

21  travel-is-restricted-to condition that the other districts

22  would be for court purposes or employment purposes and would

23  have to be approved by pretrial before he could go.

24           THE COURT:  Okay.  I'm not going to do any

25  residential restrictions.  Let's see.  Okay.

1              Those are the conditions of your release,

2   Mr. Gaulden.  Do you understand those conditions of release,

3   sir?

4              THE DEFENDANT:  Yes, Your Honor.

5              THE COURT:  Okay.  Let me tell you what will

6   happen if you violate any one of those conditions.  Your

7   release could be revoked.  Your bond could be forfeited.  A

8   warrant could issue for your arrest.  And you could be found to

9   be -- you could be charged and found to be in contempt of court

10  which is a separate and distinct offense from what you are

11  already charged with.

12             Do you understand those consequences of violating

13  these conditions?

14             THE DEFENDANT:  Yes, Your Honor.

15             THE COURT:  And with that understanding, sir, do

16  you still agree to abide by the conditions of your release?

17             THE DEFENDANT:  Yes, Your Honor.

18             THE COURT:  All right.  So --

19             PRETRIAL SERVICES OFFICER:  Excuse me,

20  Your Honor.

21             THE COURT:  I have here a document through which

22  you have waived certain rights that you're entitled to because

23  the charges are pending in another district.  This document now

24  only has you waiving identity hearing.

25             Counsel, did you want me to -- do you want to

 1   revise this document to add waiver of all the other

 2   out-of-district --

 3                  MR. FLIER:  Yes, Your Honor.

 4                  THE COURT:  Thank you.

 5                  PRETRIAL SERVICES OFFICER:  Excuse me,

 6   Your Honor.  This is United States Pretrial Services again.

 7                  In regard to the location monitoring program, do

 8   you want the bracelet to be placed on him within 24 hours of

 9   release?

10                  THE COURT:  Yes.  And, in fact, I wrote that

11   here, and I did not say it.  So thank you for reminding me, and

12   I'm going to put it on the record.

13                  So you are to report to pretrial services within

14   24 hours of your release, Mr. Gaulden, so that the location

15   monitoring device can be placed on you.  Okay?

16                  THE DEFENDANT:  (Inaudible.)

17                  THE COURT:  Do you understand that, sir?

18                  THE DEFENDANT:  Yes, Your Honor.

19                  THE COURT:  Okay.  Do you agree to abide by that

20   condition?

21                  PRETRIAL SERVICES OFFICER:  Thank you,

22   Your Honor.

23                  THE DEFENDANT:  Yes, Your Honor.

24                  PRETRIAL SERVICES OFFICER:  Your Honor, just to

25   clarify one more thing, the cash that he is to give to the

1    trust account, was that 500,000?

2                THE COURT:  Yes.

3                PRETRIAL SERVICES OFFICER:  Okay.  Thank you.

4                THE COURT:  You're welcome.

5                Mr. Gaulden, I have here a document through which

6    you waive all of your out-of-district rights which include an

7    identity hearing, arrival of process, and a preliminary

8    hearing.

9                Have you had an opportunity to discuss with your

10   attorney what it means to waive those rights, sir?

11               THE DEFENDANT:  Yes, Your Honor.

12               THE COURT:  And do you understand what it means,

13   sir?

14               THE DEFENDANT:  Yes, Your Honor.

15               THE COURT:  And with that understanding, do you

16   still wish to waive your rights to your out-of-district rights?

17               THE DEFENDANT:  Yes, Your Honor.

18               THE COURT:  Okay.  And, Mr. Flier, is this your

19   signature indicating that you concur with the waiver?

20               MR. FLIER:  Yes, Your Honor.

21               THE COURT:  Okay.  The Court finds the waiver

22   knowing and voluntary and accepts it as such.

23               So, Mr. Gaulden, you are to be -- right now you

24   are going to be temporarily detained until all of this issue of

25   the bond is resolved and posted and is in the Court's hands.

1    Until then you are remanded to the custody of the U.S. Marshal.

2              I'm stopping here because I am going to -- I'm

3    trying to figure out what I'm going to do with you,

4    Mr. Gaulden, in all honesty, whether to have you transported to

5    Louisiana or stay in California.  I don't have a sense that

6    there is a dire need to stay in California for any reason.

7              I mean, all of this can happen without him;

8    correct?

9              MR. FLIER:  Is that to me, Your Honor?

10             THE COURT:  Yeah.

11             MR. FLIER:  I think, in an abundance of caution,

12   that he should remain in our jurisdiction until we really

13   figure out what the Government is going to do, of course, about

14   your order, about getting a property bond and all the other

15   conditions.  I would recommend that he stays in California at

16   the present.

17             THE COURT:  It's going to take you how long to do

18   these property bonds?

19             Is there a hearing date over in Louisiana?  Have

20   any dates been set?  I know that -- Mr. Morris, are there any

21   dates in Louisiana?

22             MR. MORRIS:  No, Your Honor.  There are no dates

23   set at this point, but we would ask that he be transported to

24   Louisiana to answer to the charges.

25             THE COURT:  I think I'm going to have him

1    transported to the district of -- Mr. Morris, you're here.

2    What district are you?  Because this is the 19th Judicial

3    District.

4                MR. MORRIS:  Judge, the 19th Judicial District

5    was the venue for his predicate felony conviction in state

6    court.  We are the Middle District of Louisiana.  That is the

7    Court on his charging document.

8                THE COURT:  Got it.  Okay.  Thank you very much.

9                MR. FLIER:  Your Honor, I would respectfully ask

10   that he is not immediately transported until we figure all this

11   out.  It might take at the most maybe up to a week.  I think it

12   defeats a lot of the purpose.

13               THE COURT:  He doesn't live here.

14               MR. FLIER:  I understand that.  But I think that

15   it's easier to do in our jurisdiction when the law firm,

16   myself, and we have to deal with all these issues more locally

17   clearly.  But I will leave that up to the judgment of the

18   Court.

19               There is no doubt that, if we are able to comply

20   with all these terms, that the Court can order the defendant

21   into the Louisiana jurisdiction.  He will pay for the expenses.

22   He will do what he is supposed to do.

23               THE COURT:  I'm going to have him remanded to the

24   U.S. Marshal, transported to the Middle District of Louisiana.

25   Then all of this will play out in whatever way it's going to

1    play out depending on what Louisiana court is going to do.  So

2    I think for now I'm going to have him transported to the Middle

3    District of Louisiana.

4                    Okay.  Anything else from the parties?

5                    MR. FLIER:  Not --

6                    MS. THERIOT:  Your Honor, just one more thing

7    briefly.  Can the Court please unseal the Indictment?

8                    THE COURT:  Yes.  Is there -- I take it the

9    defendant doesn't object.

10                   MR. FLIER:  We do not object.

11                   THE COURT:  Okay.  Yes.  The Court orders the

12   Indictment unsealed.

13                   MS. THERIOT:  Thank you, Your Honor.

14                   THE COURT:  You're welcome.  All right.

15   Anything -- where is my little side language?  Just a minute.

16   Okay.  I did it again.  I'm sorry.

17                   I have to read you folks the Rule 5 language that

18   I don't think any -- in compliance with Rule 5, the prosecution

19   is reminded that in all criminal proceedings the prosecutor is

20   ordered to comply with the disclosure obligations under

21   *Brady v. Maryland,* 373 U.S. 83, 1963, and its progeny and is

22   reminded of the possible consequences of not doing so including

23   exclusion of evidence, adverse jury instructions, dismissal of

24   charges, contempt, referral to a disciplinary authority, and

25   sanctions.

1        Okay.  All right.  Mr. Gaulden, don't make me
2   look bad here.
3            THE DEFENDANT:  I won't, Your Honor.  I thank you
4   for the opportunity.
5            THE COURT:  Okay.  All right.  Anything else,
6   Mr. Munoz?  Have I missed anything?
7            THE CLERK:  No, judge.
8            THE COURT:  I just want to take this one moment
9   to thank the entire court staff for staying this late to
10  address this issue.  It is absolutely Mr. Gaulden's right to
11  have this hearing, but this has gone beyond what is normal for
12  us.  And so thank you to all the court staff.  We really
13  appreciate it.
14           MR. FLIER:  I agree with that.  Thank you.
15           THE COURT:  All right.  I think we're done.
16           (Proceedings concluded at 7:04 p.m.)
17
18
19
20
21
22
23
24
25

1     CERTIFICATE OF OFFICIAL REPORTER

2

3

4

5          I, MIRANDA ALGORRI, FEDERAL OFFICIAL REALTIME

6     COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR

7     THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT

8     PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE

9     FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE

10    STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE

11    ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN

12    CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF

13    THE UNITED STATES.

14

15          DATED THIS  12TH  DAY OF MAY, 2021.

16

17

18          /S/ MIRANDA ALGORRI

19          MIRANDA ALGORRI, CSR NO. 12743, CRR
            FEDERAL OFFICIAL COURT REPORTER
20

21

22

23

24

25