# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

UNITED STATES OF AMERICA                                    CRIMINAL ACTION

VERSUS                                                          21-14-SDD-SDJ

KENTRELL D. GAULDEN

## <u>RULING</u>

This matter is before the Court on the *Motion to Suppress*[1] filed by the Defendant, Kentrell Gaulden ("Gaulden"). The United States ("the Government") filed an *Opposition*[2] to this *Motion,* and Gaulden filed a *Reply.*[3] The Court held a three-day evidentiary hearing.[4] The Court ordered the parties to file post-hearing briefs,[5] and both parties complied.[6] The Court then requested supplemental briefing,[7] which both parties filed.[8] For the reasons set forth below, Gaulden's *Motion*[9] shall be granted in part and denied in part.

## I.    FACTUAL BACKGROUND

Gaulden has been charged with possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g)(1) and possession of a firearm not registered in the

---

[1] Rec. Doc. No. 53.
[2] Rec. Doc. No. 66.
[3] Rec. Doc. No. 114
[4] Rec. Doc. Nos. 130, 133, 140.
[5] Rec. Doc. No. 140.
[6] Rec. Doc. Nos. 156, 157.
[7] Rec. Doc. No. 160.
[8] Rec. Doc. Nos. 161, 162.
[9] Rec. Doc. No. 53.

Document Number: 70377

national firearms registration and transfer record in violation of 26 U.S.C. § 5861(d).[10] The Court finds the following facts by a preponderance of the evidence based on the evidence presented at a *Franks*[11] hearing and a contemporaneous *Motion to Suppress* hearing.[12]

The events critical to deciding the *Motion* began on September 27, 2020. On September 27th a "reliable source" informed a senior Baton Rouge Police Department ("BRPD") officer that a group of people were on Chippewa Street carrying firearms and filming a rap music video. This senior BRPD officer relayed the information to Sgt. Jesse Barcelona, a patrolman who had previously been assigned to the BRPD Street Crimes Unit ("the Street Crimes Unit"), who then investigated. Sgt. Barcelona and four or five other officers in his unit went to the scene but were unable to corroborate the information provided by the source.[13] In other words, the officers did not find any firearms or evidence of a rap video filming. According to Sgt. Barcelona, he was unable to corroborate the information relayed to him because he did not have sufficient manpower to conduct a thorough search.

The next afternoon officers were dispatched to the 3800 block of Chippewa following an anonymous 911 caller's report that there were several people walking around the area carrying firearms.[14] Sgt. Barcelona heard the dispatch and relayed to Sergeant

---

[10] Rec. Doc. No. 1.
[11] *Franks v. Delaware*, 438 U.S. 154 (1978).
[12] The hearings occurred on October 18 (Rec. Doc. No. 130), October 19 (Rec. Doc. No. 133), and October 22, 2021 (Rec. Doc. No. 140).
[13] Rec. Doc. No. 145, p. 183, 189.
[14] The following is a transcript of the call:
    911 Operator: "City Police Emergency"
    Complainant: "Yes ma'am uh I'm callin' I have loved ones live over there, it's on with this here lil rapper whatever. They got so many of them over there with Uzis and AKA guns just walkin' up and down the street."
    911 Operator: "Where is this ma'am?"
    Complainant: "On Chippewa right off of 38th street goin' towards Foster Driveway"

Document Number: 70377

David Kennedy ("Sgt. Kennedy") the information from the September 27th reliable source—even though the information could not be corroborated.

Sgt. Kennedy was the first officer to arrive on the scene "in the evening time, maybe 5:00."[15] Footage from Sgt. Kennedy's body camera reveals that he parked, exited his unit, and immediately grabbed the nearest person by the shirt.[16] Sgt. Kennedy, still holding the person's shirt, then ordered several other people to sit down in the street. After those people complied, Sgt. Kennedy handcuffed four of them together and proceeded to order other people in the area to sit down in the street as well. At this point,

---

911 Operator: "And you said they walking them down the street?"
Complainant: "Yes ma'am"
911 Operator: "Can you give me a description of anybody that has a gun?"
Complainant: "Who? They got dreads um.. twists in they head. They black males and…"
911 Operator: "So how many did you see?"
Complainant: "About seven of them"
911 Operator: "So every last one of them had a gun in their hand?"
Complainant: "Uh all the ones I seen"
Complainant: "And we got a lot of older people, senior citizens, homeowners"
911 Operator: "And which way were they going?"
Complainant: "They just they standin' in front of a house. I don't know if it's the boy grandparent or who."
911 Operator: "You didn't see the address they standing in front of?"
Complainant: "No ma'am I didn't see that"
911 Operator: "Is the house on Chippewa or is it on 38th Street?"
Complainant: "It's on, it's on Chippewa. You turn off of 38th on Chippewa, going towards Foster Driveway."
911 Operator: "You said it's on the end going towards Foster?"
Complainant: "Yeah, it's on, it's right off of 38th. Once you turn off of 38th coming from uh Choctaw and you turn right…"
911 Operator: "Okay. I don't know which, I don't know which way they coming from."
Complainant: "Well they'll know cause they all... we always calling 'em out there and I just hope they don't wait 'til they leave cause that's, you know, too much are goin' on over there"
911 Operator: "Okay. You want to be contacted?"
Complainant: "No ma'am. No ma'am."
911 Operator: "Okay. Alright. I'll get somebody to go check it."
Complainant: "Okay, thank you."
Rec. Doc. No. 66, p. 2–4.
[15] Rec. Doc. No. 145, p. 128
[16] Defense Exhibit 8; When asked on cross-examination whether he had seen that person with "a gun or any drugs or anything like that," Sgt. Kennedy responded "no." Rec. Doc. No. 145, p. 141. Sgt. Kennedy clarified in response to the question "[a]t this point what crime has he committed?" that the person was "being detained in reference to the investigation that [we were] conducting." *Id.*

other officers had arrived on the scene, and an officer placed Gaulden in the back of a police car. Sgt. Kennedy testified that it was the intent of the responding officers to detain everyone on the scene because of the "totality of the circumstances," "information that [the Street Crimes Unit] had," and the fact that people ran away as he approached the scene.[17]

After the detentions, the Street Crimes Unit began their investigation. Marvin Ramsey ("Ramsey") had fled when officers arrived on the scene and was caught. Ramsey was in possession of a firearm and a black Sony 7R camera on a rotating mount, which contained an SD card.[18] Gaulden is charged with possessing the firearm recovered from Ramsey and seeks to suppress it.

The officers also secured seven vehicles, but the only ones relevant to this *Motion* are a Cadillac Escalade ("the Cadillac") and an Acura SUV ("the Acura"). Corporal Barnett ("Cpl. Barnett") of the Street Crimes Unit applied for warrants to search the Cadillac and Acura at around 6:30 and 6:45 p.m., respectively.[19] Judge Foxworth-Roberts, of the 19th Judicial District Court, issued warrants to search the Cadillac and Acura by 7:00 p.m.[20] A firearm was found in the Acura, and more SD cards were found in the Cadillac. Those SD cards were found in the camera bag for the camera that Ramsey possessed. The bag also contained firearm magazines for the firearm that Ramsey possessed and a letter addressed to Ramsey. Gaulden is charged with possessing the firearm found in the Acura and seeks to suppress it.

---

[17] *Id.* at 136.
[18] An SD card is a type of memory storage device.
[19] *See* Defense Exhibits 29 and 79 and the timestamps in the signature blocks therein.
[20] *Id.*

Document Number: 70377

Around 9:30 p.m., Cpl. Barnett applied for another warrant, seeking authorization to search all of the SD cards, the camera, and a MacBook Pro found at the scene.[21] Judge Foxworth-Roberts issued that warrant before 10:00 p.m. The subsequent search of the SD cards yielded images and video (the "SD Card Media") that appear to show Gaulden possessing firearms. Gaulden seeks to suppress the SD card media.

Gaulden attacks the evidence in several ways. First, he argues that the firearms and SD card media are fruits of the illegal detentions of "Gaulden, Ramsey, and [the other people arrested] on September 28, 2020."[22] He seeks suppression under the fruit of the poisonous tree doctrine.[23] This is Gaulden's only argument for suppressing the firearm found in Ramsey's possession.

Second, Gaulden challenges the warrants for the Cadillac and Acura. He argues that the warrants were unconstitutional under the Fourth Amendment because they lack particularity. Moreover, he argues that the probable cause affidavits used to obtain the warrants, all authored by Cpl. Barnett, contained numerous falsehoods and material omissions, so the warrants are invalid under the Supreme Court's decision in *Franks v. Delaware*.[24] On that basis, he seeks to suppress the firearm found in the Acura as the fruit of an unconstitutional warrant. He also seeks to suppress the SD Card Media as the fruit of the unconstitutional warrant to search the Cadillac.

Finally, Gaulden challenges the warrant to search the SD cards and obtain the SD Card Media. He levels a *Franks* challenge and also argues that the warrant was technically flawed on its face.

---

[21] *See* Defense Exhibit 26 and the timestamps in the signature blocks therein.
[22] Rec. Doc. No. 156, p. 1.
[23] *Wong Sun v. United States*, 371 U.S. 471, 488 (1963).
[24] 438 U.S. 154 (1978).

Document Number: 70377

## II.    LAW AND ANALYSIS

The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.[25]

The Framers of the Constitution wrote the Fourth Amendment as a response to the "general warrants" of the colonial era, which allowed British officials to conduct arbitrary and far-reaching searches of homes for criminal activity.[26] Therefore, the Framers required that warrants specifically describe the place to be searched and the items to be seized. The English conception of property rights, best summarized by the ubiquitous phrase "every man's house is looked upon by the law to be his castle,"[27] is evident in the wording of the Amendment. But the Supreme Court has long held that the Fourth Amendment protects privacy rights as well.[28] In *Katz v. United States*,[29] the Court established that the Fourth Amendment "protects people, not places"[30] and expanded the Court's "conception of the Amendment to protect certain expectations of privacy as well."[31]

Property and privacy rights are personal in nature, so one cannot seek to suppress evidence when the property or privacy rights of another have been violated. As Justice

---

[25] U.S. Const. amend. IV.

[26] *Carpenter v. United States*, 138 S. Ct. 2206, 2213 (2018) (cleaned up).

[27] 3 W. Blackstone, Commentaries on the Laws of England 288 (1768); see also the remarks of William Pitt, "The poorest man may, in his cottage, bid defiance to all the force of the Crown. It may be frail; its roof may shake; the wind may blow through it; the storm may enter; the rain may enter; but the King of England may not enter; all his force dares not cross the threshold of the ruined tenement." N. Lasson, *The History and Development of the Fourth Amendment to the United States Constitution*, 49–50 (1937).

[28] *Katz v. United States*, 389 U.S. 347, 351 (1967).

[29] *Id.*

[30] *Id.*

[31] *Carpenter v. United States*, 138 S. Ct. 2206, 2213 (2018).

Document Number: 70377

Scalia explained, "[t]he obvious meaning of the provision is that *each* person has the right to be secure against unreasonable searches and seizures in *his own* person, house, papers, and effects."[32] This principle has led to the substantive doctrine called Fourth Amendment standing. As the Fifth Circuit explained, "the Fourth Amendment standing inquiry is both defendant- and place-specific: it requires that a particular defendant (the suppression movant) have a property or privacy interest in a particular place (the area searched)."[33]

The requirement of specificity is both the promise of the Fourth Amendment and a limitation on its scope. Law enforcement must have probable cause to search a place and seize an item within that place. An application for a warrant must describe with particularity the place to be searched and the items to be seized so that the judge reviewing the application can determine whether probable cause exists.[34] Particularity is required so that the officer executing the warrant does not enlarge its scope to that of a general warrant.[35] Likewise, when a law enforcement officer seeks to conduct an investigatory detention of a person, the officer must have "a particularized and objective basis for suspecting the *particular* person stopped of criminal activity."[36] The Fourth Amendment also requires specificity as to the defendant, place searched, and items seized. A defendant seeking suppression must be able to articulate how his privacy or property rights in a particular item or place have been violated. In other words, Fourth

---

[32] *Minnesota v. Carter*, 525 U.S. 83, 92 (1998) (Scalia, J. concurring) (emphasis in original).
[33] *United States v. Beaudion*, 979 F.3d 1092, 1097 (5th Cir. 2020).
[34] *United States v. Christine*, 687 F.2d 749, 752 (3d Cir. 1982).
[35] *Id.*
[36] *United States v. Cortez*, 449 U.S. 411, 417 (1981) (emphasis added).

Document Number: 70377

Amendment rights may not be asserted vicariously.[37]  This case places the Fourth Amendment's standing and specificity requirements in sharp relief.

### A.  Fourth Amendment Standing

A defendant seeking suppression must show that "'his *own* Fourth Amendment rights [were] infringed by the search and seizure which he seeks to challenge.'"[38] Although termed "standing," Fourth Amendment "standing" "is not a jurisdictional question,"[39] rather, it requires that the defendant seeking suppression show that the alleged unreasonable search or seizure infringed a Fourth Amendment interest of the defendant himself.[40]

The Fifth Circuit has stated:

> A defendant can establish this personalized interest in one of two ways. First, he may object to the physical intrusion of a constitutionally protected area in which he has a property interest. And second, he may object to government action that violates a reasonable expectation of privacy in the place searched.[41]

A defendant must make two showings to establish a "reasonable expectation of privacy." First, a defendant must show that he has a "subjective" expectation of privacy.[42] Second, "the expectation [must] be one that society is prepared to recognize as reasonable."[43] "The reasonableness of an expectation of privacy turns on our societal understanding about what deserves protection from government invasion."[44]

---

[37] *Rakas v. Illinois*, 439 U.S. 128, 133 (1978).
[38] *Id.* (emphasis in original).
[39] *Byrd v. United States*, 138 S. Ct. 1518, 1530 (2018).
[40] *Id.*
[41] *United States v. Beaudion*, 979 F.3d 1092, 1097 (5th Cir. 2020).
[42] *United States v. Turner*, 839 F.3d 429, 434 (5th Cir. 2016).
[43] *Id.* (internal citations omitted).
[44] *Id.* at 435 (cleaned up).

Document Number: 70377

Gaulden seeks to suppress the firearm found in Ramsey's possession, the firearm found in the Acura, the SD Card Media, and the SD cards recovered from the Cadillac. Gaulden bears the burden of establishing his Fourth Amendment standing.[45]

### 1. Fourth Amendment Standing as to the Firearms

Gaulden's Fourth Amendment standing argument as to the firearms is shaky because the firearms were not recovered from his person. Therefore, he invokes the fruit of the poisonous tree doctrine. The fruit of the poisonous tree doctrine "prohibits the introduction at trial of all evidence that is derivative of an illegal search, or evidence known as the fruit of the poisonous tree."[46] However, not all evidence is excluded "merely because it would not have been discovered 'but-for' a constitutional violation."[47] Instead, the question is "whether, granting establishment of the primary illegality, the evidence to which the instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint."[48]

Gaulden presses that he can seek to suppress both firearms because "[n]o weapon would have ever been removed from a vehicle or from Marvin Ramsey were it not for the unconstitutional detentions that began the moment the police arrived onto the 3800 block of Chippewa."[49] Gaulden points to the fact that the recovery of the firearms "was within close temporal proximity to the unlawful detentions."[50] He also asserts that "[t]here were no intervening circumstances to attenuate the physical restraint of the

---

[45] *United States v. Fields*, No. CR 20-76-SDD-SDJ, 2021 WL 3215089, at *1 (M.D. La. July 29, 2021).
[46] *United States v. Hernandez*, 670 F.3d 616, 620 (5th Cir. 2012).
[47] *Id*. (cleaned up).
[48] *Id*.
[49] Rec. Doc. No. 156, p. 18.
[50] *Id*.

Document Number: 70377

people from the searches and seizures of their persons and/or vehicles…."[51] Gaulden cites this Court's decision in *United States v. Fields*[52] in support.

The defendant in *Fields* was a passenger in a vehicle parked in the driveway of a house.[53] He sought to suppress several firearms that were found under the house.[54] The Government argued that Fields lacked Fourth Amendment standing to contest the search under the house because Fields lacked a reasonable expectation of privacy as to the house.[55] The Court did not decide that issue. Instead, the Court applied the established rule that a passenger in a vehicle that is stopped by police officers is seized within the meaning of the Fourth Amendment.[56] Therefore, Fields had standing to contest his seizure and the firearms as fruits of that seizure.[57] The Court held that Fields was unconstitutionally seized and that the firearms must be suppressed as fruits of that unconstitutional seizure.[58] The Court found determinative the arresting officer's testimony that he searched under the house because he had arrested Fields, who, according to the arresting officer, was known to often be in possession of firearms.[59] The arresting officer thus drew a direct connection between seizing Fields and searching under the house for firearms.

Gaulden relies on footnote 60 in *Fields*: "[I]t is not the case that the fruit of the poisonous tree doctrine applies only when the defendant has standing regarding both the violation which constitutes the poisonous tree and separate standing regarding the

---

[51] *Id*.
[52] *United States v. Fields*, No. CR 20-76-SDD-SDJ, 2021 WL 3215089, at *1 (M.D. La. July 29, 2021).
[53] *Id*.
[54] *Id*. at 12.
[55] *Id*.
[56] *Id*.
[57] *Id*.
[58] *Id*.
[59] *Id*. at 3.

Document Number: 70377

evidence which constitutes the fruit of that poisonous tree."[60] Therefore, the *Fields* defendant could challenge the seizure of his person as a violation of his privacy interest regardless of whether he could establish a property interest in the items he sought to suppress.

Likewise, Gaulden can challenge the seizure of his person[61] as a violation of his privacy interest regardless of whether he has a property interest in the items he seeks to suppress. But, unlike the defendant in *Fields*, Gaulden has proffered no evidence that either firearm was recovered as a result of his arrest. Instead, Gaulden attempts to connect all of the arrests to all of the evidence that the arresting officers recovered.[62] However, because Fourth Amendment rights are personal, Gaulden cannot vicariously assert the rights of everyone arrested that day.[63] Therefore, Gaulden lacks Fourth Amendment standing to contest Ramsey's seizure or the recovery of a firearm recovered from Ramsey—regardless of the constitutionality of that seizure. Accordingly, his *Motion* must be denied as to the firearm recovered from Ramsey.

Additionally, Gaulden produced no evidence to show that he had a reasonable expectation of privacy or a property interest in the Acura or Cadillac. He has therefore failed to establish that he has Fourth Amendment standing to challenge the warrants to search the Acura and Cadillac—regardless of whether they were constitutionally sufficient. Gaulden's *Motion* must be denied as to the firearm recovered from the Acura and the SD cards found in the Cadillac.

---

[60] *Id*. at 4, n. 60.
[61] *Terry v. Ohio*, 392 U.S. 1 (1968).
[62] Rec. Doc. No. 156, p. 18.
[63] *Rakas v. Illinois*, 439 U.S. 128, 133 (1978).

Document Number: 70377

## 2. Fourth Amendment Standing as to the SD Card Media[64]

The Government argues that Gaulden lacks a reasonable expectation of privacy as to the camera and the SD cards because Ramsey owned those items.[65] Further, it is Gaulden's burden to establish an expectation of privacy as to those items, and he presented no evidence on that point. Therefore, Gaulden lacks standing to suppress the camera and the SD cards. But finding that Gaulden lacks standing to suppress the SD cards is not the end of the inquiry. Although he cannot challenge the seizure of the cards themselves, he may have a constitutionally protected privacy interest in the contents of the SD cards, the SD Card Media.

As to Gaulden's purported reasonable expectation of privacy in the SD Card Media, the Government pushes a two-pronged argument. First, Atlantic Records has a property interest in the media, so Gaulden cannot have a reasonable expectation of privacy as to it.[66] And second, the media serves a commercial purpose, so it is entitled to less protection than personal property, per the Supreme Court's decision in *Minnesota v. Carter*.[67]

Gaulden urges that Atlantic Records has no role in the production, creation, or distribution of the videos until Gaulden incorporates it into music videos.[68] He asserts that Atlantic Records "considers the footage to be Gaulden's private property until its incorporated into a video."[69]

---

[64] The Court has already held that Gaulden has standing to seek to suppress the SD Card Media. *See* Rec. Doc. No. 145, p. 145–146. However, the Court provides additional reasons for its ruling herein.
[65] Rec. Doc. No. 157, p. 18.
[66] *Id*. at 17–19.
[67] *Id*. at 17–19 (citing *Minnesota v. Carter*, 525 U.S. 83, 90 (1998)).
[68] Rec. Doc. No. 156, p. 3.
[69] *Id*.

Document Number: 70377

Gaulden called three witnesses in support of his argument that he has Fourth Amendment standing to contest the search of the SD Card Media: Karen Boss of Red River Bank; Julie Greenwald ("Greenwald"), the Chairman of Atlantic Records; and Lily Thrall ("Thrall"), the Director of Video Operations at Atlantic Records. Karen Boss testified that according to bank records, a company owned by Gaulden paid Ramsey in July 2020.[70] A notation attached to the payment identified Ramsey as "camera man."[71]

Greenwald's testimony was extensive. On direct examination, she testified that Gaulden is often accompanied by a photographer or videographer who captures lifestyle images and video of Gaulden.[72] Greenwald explained that Gaulden uploads songs, music videos, and other content directly to YouTube and other social media platforms.[73] Greenwald defined "content" as "all kinds of lifestyle content that isn't…music videos."[74] After Gaulden uploads the media, Atlantic Records "clears it up," meaning it ensures that the proper royalties are paid and other music industry norms are followed.[75] Importantly, Greenwald testified that Atlantic Records never sees the "overwhelming majority" of footage that is shot. Specifically, she testified that:

> As a practice, he shoots a lot of stuff, and then he determines what he wants to go up on YouTube, what he actually wants us to, you know put up ourselves and then share with other platforms like Apple and Facebook and Amazon. But, you know, for the most part we have no idea when he's shooting, you know, when he's shooting music videos or content. He, you know, puts it up and we usually come behind him.[76]

---

[70] Rec. Doc. No. 145, p. 96.
[71] *Id*.
[72] *See infra*, discussion on p. 17.
[73] Rec. Doc. No. 145, p. 102–104.
[74] *Id*. at 106.
[75] *Id*. at 105.
[76] *Id*.

Document Number: 70377

Further, Greenwald testified that, "[u]nless [Gaulden] specifically sends [footage] to YouTube or us, I would have no idea what is on the footage."[77] Additionally, in response to a question on direct as to whether she could "demand" that Gaulden turn over footage to Atlantic Records, Greenwald testified that "we would never demand anybody to give us art or music that they don't want us to have…"[78]

On cross examination, the Government elicited testimony that Atlantic Records maintains some rights over Gaulden's professional image and his music insofar as he cannot unilaterally use his image to promote his music for another record label.[79] Additionally, the Government adduced testimony that Atlantic Records had reimbursed Gaulden for costs of videos he submitted that "[Atlantic Records] needed to claim."[80] Greenwald also testified that videos that Gaulden "puts up" are used for the commercial purpose of promoting his music.[81]

Thrall, Atlantic's Director of Video Operations, explained that there was a distinction between "formal videos that go on YouTube" and "every-day lifestyle footage that people may upload on social media."[82] In sum, the development of the "formal videos" is managed by Atlantic Records while "every-day lifestyle footage" is not.[83] Thrall also testified that she only received edited videos from Gaulden and never "raw" footage, which she explained is footage taken directly from the camera without any editing.[84]

---

[77] *Id*. at 106–107.
[78] *Id*. at 109.
[79] *Id*. at 110–11.
[80] *Id*. at 113.
[81] *Id*. at 114–115.
[82] *Id*. at 117.
[83] *Id*. at 117–18.
[84] *Id*. at 123–24.

Document Number: 70377

On cross examination, Thrall stated that she knew she was not receiving "raw" footage from Gaulden because raw footage uses a different file format.[85] She testified that all of the video footage that is shot is to promote Gaulden's "music and lifestyle."[86] In response to the question, "[h]is lifestyle is for a commercial purpose, correct?," Thrall testified, "[i]t would be exploited for a commercial purpose if Atlantic [Records] receives it."[87]

Based on the testimony summarized above and other evidence adduced at the hearing, the Court finds that the following facts were established by a preponderance of the evidence. Gaulden's company paid Ramsey for cameraman services in July 2020. Gaulden records much of his daily life through hired videographers, including Ramsey. Gaulden sometimes uploads excerpts of lifestyle videos directly to YouTube without the prior involvement or knowledge of Atlantic Records. Atlantic Records does not see the majority of media that Gaulden creates. It is unclear whether Atlantic Records has the ability to demand that Gaulden provide it with the media that he creates. Atlantic Records has some rights as to Gaulden's professional image and his music. Atlantic Records has, at some point, reimbursed Gaulden's company for the costs of media that Atlantic Records became involved with after Gaulden in some way distributed that media. If Atlantic Records receives and publishes media from Gaulden, or if Gaulden publishes media directly on YouTube or social media, that media is used for a commercial purpose. Conversely, if Gaulden does not share media with Atlantic Records or otherwise distribute the media, the undistributed media is not used for a commercial purpose. Critically,

---

[85] *Id*. at 125–26.
[86] *Id*. at 125–26.
[87] *Id*. at 126.

Document Number: 70377

Atlantic Records is not involved in the media that Gaulden captures until the media is published directly by Gaulden or distributed by Gaulden to Atlantic Records.

The parties' arguments center around a property rights-based understanding of the scope of the Fourth Amendment. However, as the Supreme Court recently explained in *Byrd v. United States*,[88] "[e]xpecations of privacy protected by the Fourth Amendment, of course, need not be based on a common-law interest in real or personal property, or on the invasion of such an interest."[89] But these "'property concepts' are instructive in 'determining the presence or absence of the privacy interests protected by that Amendment.'"[90] The Court clarified that the "'traditional property-based understanding of the Fourth Amendment'" was supplemented, but not displaced, by the reasonable expectation of privacy test.[91] Further, "in the main, 'one who owns or lawfully possesses or controls property will in all likelihood have a legitimate expectation of privacy by virtue of the right to exclude.'"[92] In sum, while a property interest in the area searched or thing seized is usually sufficient to establish a reasonable expectation of privacy, it is not necessary.

The Atlantic Records witnesses testified that Atlantic Records had no claim to Gaulden's raw video footage unless and until the media was incorporated into published content that promoted Gaulden's professional persona. Greenwald and Thrall consistently and credibly testified that there is a substantial amount of media that they had never seen because it was never incorporated into a music video or other online

---

[88] 138 S.Ct. 1518 (2018).
[89] *Id.* at 1526.
[90] *Id.* (citing *Rakas v. Illinois*, 439 U.S. 128, 133 (1978)).
[91] *Id.*
[92] *Id.* (citing *Rakas*, 439 U.S. at 144, n. 12 (1978)).

Document Number: 70377

content. This fact strongly suggests that Gaulden retained a property interest in the SD Card Media since it had not been incorporated into music videos or other content. While some of the images and video captured on the SD cards may have been destined for commercial use, Gaulden maintained and exercised the right to decide what media to hold as private property and what media to release to a public platform for commercial use. Moreover, even if Atlantic Records had a property interest in the SD Card Media, that property interest does not automatically render Gaulden's expectation of privacy as to the SD Card Media unreasonable.[93]

As to Ramsey's property interest in the SD Card Media, the Government is correct that Gaulden has failed to establish a property or privacy interest in the camera and SD cards themselves, but it does not follow that he has failed to establish a property or privacy interest in the SD Card Media. Karen Boss's testimony established that Gaulden's company paid Ramsey for "camera man" services two months before his arrest.[94] It is irrelevant that there was not a payment closer in time to the day of Gaulden's arrest because it is undisputed that Ramsey was using a camera to record media of Gaulden on the day of the arrests. The Court finds that, based on the evidence before it, Ramsey was functioning as Gaulden's cameraman on the day of the arrests. Therefore, the question before the Court is: does one have a property interest or reasonable expectation of privacy in video and images recorded by his cameraman?

---

[93] In *Minnesota v. Olson*, the Supreme Court held that an overnight guest has an expectation of privacy in his host's home. 495 U.S. 91, 99 (1990). This was despite the fact that an overnight guest has no property interest in the home of his host.

[94] Contrary to the Government's argument, the Court does not find it relevant that Gaulden's company made the payment rather than Gaulden individually. The payment was for Gaulden's benefit and made on his behalf. The Court strongly doubts that the analysis of the scope of the Fourth Amendment's protections requires inquiry into the structure of a defendant's corporations and payroll operations.

Document Number: 70377

The *Byrd* Court instructed that a legitimate expectation of privacy "must have a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society."[95] There is a societal expectation that one who commissions another to create something is entitled to that thing upon its completion. This societal expectation is embodied explicitly in the "work made for hire" provisions of the Copyright Act. Under 17 U.S.C. § 201(b), "the employer or other person for whom the work was prepared is considered the author for the purposes of this title… [and] owns all the rights comprised in the copyright." One of the statutory definitions of "work made for hire" is "a work prepared by an employee within the scope of his or her employment."[96] There is some evidence of an informal employment relationship between Gaulden and Ramsey, and the work made for hire provisions of the Copyright Act demonstrate that there exists a societal expectation that when one commissions another to create something, the person who commissioned the creation maintains property rights in the thing created.[97] Further, these societal expectations predate the Copyright Act.[98]

---

[95] *Byrd*, 138 S. Ct. at 1522.

[96] 17 U.S.C. § 101.

[97] The Court does *not* find that Gaulden has copyright in the media Ramsey captured. Rather, the Court cites the Copyright Act solely to demonstrate that Gaulden's expectation of privacy to the SD Card Media is one which society is prepared to recognize as reasonable.

[98] As the New York Supreme Court, in the context of a mural, explained, "[w]hen a man, hereinafter referred to as a patron, contracts with an artist to paint a picture for him, of whatever nature it may be, the contract is essentially a service contract, and when the picture has been painted and delivered to the patron and paid for by him, the artist has no right whatever left in it." *Crimi v. Rutgers Presbyterian Church in City of New York*, 89 N.Y.S.2d 813, 818 (Sup. Ct. 1949); *See also, Morton v. Raphael*, 79 N.E.2d 522, 524 (Ill. App. Ct. 1948) (stating that "[u]nder the generally accepted rule a painter or writer for hire who has failed to have his work copyrighted and has failed to reserve to himself such copyright, loses the exclusive common law right therein, and ownership and all rights therein vest in the new proprietor, the person who has commissioned the artist for the work."); *Phillips v. W. G. N., Inc.*, 29 N.E.2d 849, 853 (applying the same principles to a script); *Dielman v. White, C.C.*, 102 F. 892, 894 (stating that "[i]n general, when an artist is commissioned to execute a work of art not in existence at the time the commission is given, the burden of proving that he retains a copyright in the work of art executed, sold, and delivered under the commission rests heavily upon the artist himself.")(cleaned up).

The Government argues that Gaulden cannot establish a reasonable expectation of privacy in the SD Card Media because commercial property is entitled to a lesser degree of privacy. First, the Court reiterates its previous finding that the media Ramsey captured did not become commercial property until designated by Gaulden to be used for a commercial purpose—and the SD Card Media was not. Second, the case that the Government relies on for its commercial property argument is distinguishable.

The Government relies on *Minnesota v. Carter*[99] wherein the Supreme Court stated that "[p]roperty used for commercial purposes is treated differently for Fourth Amendment purposes from residential property."[100] In *Carter*, a police officer peered through the window of an apartment and observed the defendants packaging cocaine in someone else's apartment with the consent and presence of the resident.[101] The defendants were later arrested and moved to suppress the evidence on the grounds that the officer conducted an unconstitutional search when he peered through the window of the apartment.[102] The Court concluded that the defendants had no reasonable expectation of privacy in the apartment because it was not their home, and they were only there for a commercial purpose.[103]

*Carter*, and the line of cases the *Carter* Court cited in support of the statement on which the Government relies,[104] stand for the proposition that a person who uses real property for a commercial purpose has a diminished expectation of privacy. *Carter* does

---

[99] 525 U.S. 83 (1998).
[100] *Id*. at 90.
[101] *Id*. at 85.
[102] *Id*.
[103] *Id*. at 90–91.
[104] *New York v. Burger*, 482 U.S. 691, 700 (1987) (administrative search pursuant to a statutory scheme); *Donovan v. Dewey*, 452 U.S. 594, 598 (1981) (accord); *United States v. Biswell*, 406 U.S. 311, 316 (1972) (administrative search of a pervasively regulated industry).

Document Number: 70377

not, as the Government contends, mandate that the owner of any commercial property, real or personal, lacks a reasonable expectation of privacy as to that property. The reasoning in *Carter* does not support the conclusion that Gaulden has no reasonable expectation of privacy in the SD Card Media, some of which *may* in the future be used for a commercial purpose. The analogy to *Carter* breaks down because the SD Card Media was not being used commercially. The Court holds that Gaulden has Fourth Amendment standing to challenge the search of the SD Card Media.

### B. Gaulden's Challenges to the SD Card Media

Gaulden challenges the SD Card Media warrant[105] in two ways. First, he argues that the affidavit in support of the warrant contained numerous falsehoods and omissions and therefore the warrant must be voided under *Franks v. Delaware*.[106] Second, he asserts that the warrant lacked particularity and was therefore unconstitutional on its face.[107]

### 1. *Franks v. Delaware* Analysis

The Fifth Circuit summarized the *Franks* analysis in *United States v. Ortega* ("*Ortega I*"), which was an appeal from the denial of a motion to suppress:[108]

> Under the Supreme Court's decision in *Franks*, a search warrant must be voided if the defendant shows by a preponderance of the evidence that the affidavit supporting the warrant contained a false statement made intentionally or with reckless disregard for the truth and, after setting aside the false statement, the affidavit's remaining content is insufficient to establish probable cause. Although the *Franks* inquiry is often described as two prongs, the inquiry effectively consists of three questions, all of which must be met. First, does the affidavit contain a false statement? Second,

---

[105] For ease of reference, the Court will refer to this warrant as the "SD Card Media warrant." This nomenclature is not intended to suggest that the warrant validly authorized a seizure of the SD Card Media and is merely for ease of reference.

[106] 438 U.S. 154, 171–72 (1978).

[107] Rec. Doc. No. 156, p. 12.

[108] *United States v. Ortega*, 854 F.3d 818, 826 (5th Cir. 2017) [hereinafter *Ortega I*].

Document Number: 70377

was the false statement made intentionally or with reckless disregard for the truth? And third, if the false statement is excised, does the remaining content in the affidavit fail to establish probable cause?[109]

Moreover, allegations of material omissions in the affidavit are treated "essentially similarly to claims of material misstatements."[110]

*a. Does the Affidavit Contain a False Statement or Omission?*

A statement in an affidavit is not considered false if it "could reasonably and sensibly be read in a truthful manner."[111]  In *United States v. Hare*,[112] the Fifth Circuit applied that rule by considering two possible interpretations of the challenged statement. It found that, while one interpretation of the statement would be "false," another would be truthful.[113] Therefore, the challenged statement was not false because it could be "reasonably read" as being truthful.[114] The Court must consider whether each of the alleged misrepresentations in the warrant could reasonably be read as true.

As to omissions, "[a]n omission may amount to improper government conduct only if the omission is material and the defendant shows that the affiant excluded material information 'with the intent to mislead the magistrate.'"[115]

*Ortega I* is instructive. The defendant in *Ortega I* challenged the following two statements in a probable cause affidavit written by Officer Matthew Parkinson:

[Statement 1]
Affiant did on the 18th of April, 2013 receive information from a credible and reliable person, [CI-2], who has on previous occasions given Affiant information regarding the trafficking and possession of controlled

---

[109] *Id.*
[110] *United States v. Martin*, 615 F.2d 318, 328 (5th Cir. 1980).
[111] *Ortega I*, 854 F.3d at 826 (quoting *United States v. Singer*, 970 F.2d 1414, 1417 (5th Cir. 1992)).
[112] 772 F.2d 139, 141 (5th Cir. 1985).
[113] *Id.*
[114] *Id.*
[115] *United States v. Torres*, 694 F. App'x 937, 944 (5th Cir. 2017) (quoting *United States v. Tomblin*, 46 F.3d 1369, 1377 (5th Cir. 1995)).

Document Number: 70377

substances which has proven to be true and correct but whose identity cannot be revealed for security reasons.[116]

[Statement 2]
The said credible and reliable person stated that they did within the last 48 [hours] see a controlled substance, to wit Cocaine, in the possession of the aforesaid Defendant[ ] Ortega ... inside the location at [the address of Ortega's house].[117]

Facts adduced at the hearing led the court to conclude that Statement 1 was false. Officer Parkinson had never worked directly with CI-2.[118] Rather, CI-2 had worked with another officer, Detective Mario Jacinto, who informed Officer Parkinson that CI-2 had proven reliable in the past.[119] Additionally, Officer Parkinson did not actually converse with CI-2.[120] Rather, Detective Jacinto and CI-2 conversed "mostly in Spanish, a language that Parkinson [did] not understand, and Jacinto translated for Parkinson what CI-2 had said."[121] The court held that the Statement 1 was false because Officer Parkinson had never worked with CI-2, and "a plain reading of the statement in the affidavit implies that it was Parkinson conversing with CI-2."[122]

Turning to Statement 2, facts adduced at the hearing led the court to conclude that CI-2 did not actually see cocaine inside of Ortega's residence. Rather, "CI-2 had driven his friend (Person 4) to Ortega's house so that Person 4 could purchase cocaine, and when they arrived, Ortega emerged from his house carrying cocaine and engaged in a hand-to-hand sale with Person 4 while Person 4 and CI-2 remained in the car."[123] Ortega

---

[116] *Ortega I*, 854 F.3d at 821.
[117] *Id*.
[118] *Id*. at 822.
[119] *Id*.
[120] *Id*.
[121] *Id*.
[122] *Id*. at 827.
[123] *Id*. at 822.

argued that CI-2 only purportedly saw Ortega possessing cocaine outside of his house, so the statement that CI-2 saw Ortega possessing cocaine inside his house was false.[124] The court credited the factual determination of the magistrate judge[125] insofar as "the language was not as precise and definite as it could have been, [but] it [did] appear to fairly fit the facts as they occurred.'"[126] The Fifth Circuit reasoned that CI-2 watched Ortega exit his house and walk directly to the car to sell cocaine to Person 4; therefore, Ortega must have possessed the cocaine inside of his house.[127] The court held that "[a]lthough the wording of the affidavit's statement is imprecise, it reasonably could be read as truthful."[128]

The affidavit in support of probable cause in this case provides, in relevant part:

[Statement 1]
On September 28th, 2020 at approximately 1600 hours, myself, along with the Street Crimes unit received information from a reliable source that subjects affiliated with the street gang "Never Broke Again" (NBA) and "Bottom Boy Guerillas" (BBG) were at 3866 Chippewa St. (an abandoned residence) and the abandoned lot located on the East side of the mentioned residence filming a rap video, brandishing firearms.
…
[Statement 2]
One of the subjects who ran was identified as Marvin Ramsey, in his possession was a Sony 7R digital camera (3388629), the camera used to film the rap video. Due to the several subjects in custody being convicted felons and the narcotics the camera footage needs to be seen to see who possessed which firearms that were located at the scene. [129]

Gaulden maintains that Statement 1 is materially false in the following respects:

---

[124] *Id*. at 826.
[125] The district court adopted the reasoning of the magistrate judge.
[126] *Id*.
[127] *Id*.
[128] *Id*.
[129] *See* Defense Exhibit 26.

Document Number: 70377

1. The evidence established that the reliable source did not communicate directly with Cpl. Barnett or anyone else in the Street Crimes Unit on September 28 or any other date.[130] In fact, the reliable source gave a tip to a senior BRPD officer on the day prior, who then relayed the tip to Sgt. Barcelona, who was not a member of the Street Crimes Unit at the time.

2. Cpl. Barnett omitted the fact that the information provided by the reliable source could not be corroborated.[131] The evidence established that, on September 27, 2020, upon receiving the tip about "filming a rap video [and] brandishing firearms" at or near 3866 Chippewa St., Sgt Barcelona investigated and was unable to corroborate the tip.

3. Cpl. Barnett admitted that references to the NBA and BBG gangs were inadvertently included in his affidavit and the source from the prior day never stated that there were any gangs at the location.[132]

Gaulden argues that Cpl. Barnett knew that the reliable source was not, in fact, reliable since the officers who responded on September 27th were unable to corroborate the source's information.[133] Gaulden argues that Cpl. Barnett intentionally used September 28th as the date of the tip because without the tip that a rap video was being filmed on September 28th, there was no probable cause to search the camera and SD cards on the 28th.[134]

---

[130] Rec. Doc. No. 156, p. 7.
[131] *Id.* at 7–8.
[132] *Id.* at 8.
[133] *Id.*
[134] *Id.* at 10.

Document Number: 70377

The Government argues that Cpl. Barnett "inadvertently fused" information from the September 27th reliable source and the 911 call received on September 28th when writing the affidavit.[135] The Government characterizes this as a forgivable, innocent mistake made during the chaos of an active crime scene.[136] The Government argues that regardless of this mistake, Gaulden cannot dispute that a reliable source informed BRPD on September 27th that people were on Chippewa "possibly shooting a music video with guns."[137] Additionally, the Government argues that the date is factually correct since the Street Crimes Unit received the information, which came indirectly from the reliable source, on September 28th.[138]

The Court holds that a straightforward application of *Ortega I* compels the conclusion that the challenged portions of the affidavit could not reasonably be read as truthful. In relevant part, the false portion of the affidavit in *Ortega I* provided: "Affiant did on the 18th of April, 2013 *receive information from* a credible and reliable person…"[139] The relevant part of the affidavit in this case is nearly identical as it states that "myself, along with Street Crime unit, *received information from* a reliable source..." The facts of *Ortega* are extremely similar to those of this case insofar as Detective Jacinto told Officer Parkinson (the affiant) information that Jacinto had gathered from a reliable source, and Parkinson did not actually speak with the source.[140] The Court considers itself bound by the analogous fact pattern and affidavit wording that the Fifth Circuit considered in *Ortega I*. As such, "a plain reading of the statement in the affidavit implies that it was [Cpl. Barnett

---

[135] Rec. Doc. No. 157, p. 13.
[136] *Id*. at 14.
[137] *Id*. at 13.
[138] *Id*. at 15.
[139] *Ortega I*, 854 F.3d 818, 821 (5th Cir. 2017) (emphasis added).
[140] *Id*. at 822.

Document Number: 70377

and the Street Crimes Unit] conversing with the [reliable source],"[141] so that statement is false.

The Court will next consider what portion of the affidavit should be excised and whether probable cause exists with that portion removed. If the post-excision affidavit does not establish probable cause, then the Court will consider Cpl. Barnett's state of mind.

b. *What Should be Excised?*

In *Ortega I*, the court excised "only the statement that [Officer] Parkinson received information from a confidential informant who had previously provided [Officer] Parkinson with credible and reliable information."[142] The court explained in a footnote that excising solely that statement reflected a narrow approach to excision.[143] However, the court did not decide that a broad approach was inappropriate, stating that "[a]rguably, because the affidavit falsely stated that [Officer] Parkinson received the information from CI-2, all of the information from CI-2 should be excised."[144] The court did not review the affidavit with the broader approach because it failed under the narrow approach.[145]

Unlike in this case, the *Ortega I* court had before it two distinct statements. The false, excised statement described how the affiant came to know the confidential informant's information. Applying the narrow approach, the court did not excise the statement that contained the information that the confidential informant had conveyed.

---

[141] *Id*. at 828
[142] *Id*. at n. 13.
[143] *Id*.
[144] *Id*.
[145] *Id*.

Document Number: 70377

This case is more difficult because the information conveyed by the reliable source is entwined with the false narrative of how the affiant came to know that information.

Also, in *Ortega I* the narrow approach led to a definitive result: the affidavit would have failed to establish probable cause because the informant's reliability was not sufficiently explained in the post-excision affidavit. In this case, however, employing a narrow approach and excising only "[o]n September 28th, 2020 at approximately 1600 hours, myself, along with the Street Crimes unit received information from a reliable source" leaves a nonsensical string of words which defy analysis. A narrow approach to excision in this case would leave a hypothetical affidavit containing the reliable source's information, but no indication as to how anyone came to know the information. To avoid this unworkable situation, the Court applies *Ortega I*'s broad approach.

The Court excises both that Cpl. Barnett and the Street Crimes Unit received the information from a reliable source and the information that the reliable source conveyed. In sum, the Court excises the first sentence of the affidavit. Additionally, the Court must excise a portion of the following sentence from the second paragraph of the affidavit: "[o]ne of the subjects that ran was identified as Marvin Ramsey, in his possession was a Sony 7R digital camera (3388629), the camera used to film the rap video."[146] The identification of the camera as "the camera used to film the rap video" relies upon the information that was conveyed by the reliable source. Therefore, the Court excises the reference to the rap video. Now, the Court must analyze whether the post-excision affidavit establishes probable cause.

   c. *With the False Statements Excised, Does the Remaining Content in the Affidavit Establish Probable Cause?*

---

[146] *See* Defense Exhibit 26.

Document Number: 70377

*Ortega I* stated:

> In determining whether probable cause exists without the false statements a court must make a practical, common-sense decision as to whether, given all the circumstances set forth in the affidavit [minus the alleged misstatements], there is a fair probability that contraband or evidence of a crime will be found in a particular place. Given that the state magistrate judge did not actually consider the excised affidavit, we must proceed somewhat hypothetically in determining whether the remaining content in the affidavit establishes probable cause.[147]

Further, as the Fifth Circuit explained in *United States v. Payne*, "[f]acts in the affidavit

must establish a nexus between the [thing] searched and the evidence sought."[148]

The post-excision affidavit reads:

> Upon arrival, officers observed several subjects at the mentioned location and when they saw us three subjects fled on foot and others opened vehicle doors, and then shut them immediately. The ones that didn't run walked away from the vehicles. The three subjects that fled on foot were apprehended. A search of the immediate area resulted in located approximately 8 to 9 firearms, and a small amount of narcotics.

> Search warrants were written and approved by the honorable Foxworth. A search of the vehicles resulted in locating approximately 5 to 6 firearms and more narcotics. One of the subjects who ran was identified as Marvin Ramsey, in his possession was a Sony 7R digital camera (3388629). Due to the several subjects in custody being convicted felons and the narcotics the camera footage needs to be seen to see who possessed which firearms that were located at the scene.  Ramsey was also found in possession of a Glock 21 .45 caliber handgun. Inside the 2020 Cadillac Escalade that was searched was the bag for the camera and lens for a Sony 7R, also inside was .45 caliber glock magazines (which was the firearm located on his person). Also in this bag, was a letter addressed to Marvin Ramsey, and a Mac Book Pro computer and several SD cards. A My Passport external hard drive bearing serial number : WXN1E592FFNO was also located in his bag. I respectfully request permission to look through the Sony 7R camera, SD cards, and Macbook pro to help determine who had possession of which firearm.[149]

---

[147] *Ortega I*, 854 F.3d at 828 (alteration in original).

[148] 341 F.3d 393, 400 (5th Cir. 2003).

[149] *See* Defense Exhibit 26.

Therefore, the abstract question before the Court is: when a camera is found at the scene of a suspected possession crime, but it is unknown which of several suspects possessed the contraband, is there probable cause to search the camera for photographic evidence of who possessed the contraband? In this case, the question is narrowed because the post-excision affidavit contains nothing to indicate that the camera contained evidence of crimes.

The Court finds that post-excision affidavit does not establish probable cause to seize the SD Card Media. After striking the reference to the rap video, the only fact in the affidavit that goes to probable cause to search the SD Card Media for evidence of the crimes alleged in the affidavit is the fact that the camera was recovered at the scene. However, the mere fact that a camera was recovered at the scene of an arrest does not generate a "substantial probability" that evidence of a crime will be on that camera. In the absence of additional facts in the affidavit, it is illogical to assume that people would document their illegal activities in photographs and videos. Additionally, without an allegation that the camera was in use when the alleged crimes occurred, the assertion that the camera contained evidence is purely speculative.

Moreover, a finding of probable cause on these facts would open the door to law enforcement searches of media on a cell phone whenever a cell phone is found at the scene of an arrest solely on the basis that a cell phone was found. The fact that an arrestee possessed a device capable of capturing photographs and videos at the time of his arrest cannot, in the absence of other facts, generate probable cause to search that

device.[150] The Court concludes that the post-excision affidavit lacks probable cause. Next, the Court must consider whether Cpl. Barnett possessed the requisite intent to deceive under *Franks*.

   d. *Did the Affiant Make the False Statements or Omit Material Information Intentionally or with Reckless Disregard for the Truth?*

   In *Ortega II*,[151] the Fifth Circuit considered the requisite mental state of the affiant. An intentionally false statement is one made with intent to mislead.[152] Recklessness "may be shown circumstantially when reasons to doubt the information's veracity are obvious."[153] "[T]he less damaging the whole truth is to the affiant, the weaker the inference that the affiant made a statement or omission with reckless disregard for the truth."[154] The Court must also consider the "plausibility of [the affiant's] understanding of his affidavit."[155]

   A statement or omission's materiality bears on whether the affiant was reckless in including or excluding it.[156] As the Fifth Circuit explained in *United States v. Namer*, "the analytical concepts of materiality and recklessness are often bound together…."[157] The *Namer* court, quoting a prior Fifth Circuit case explained, "[i]t is possible that when the facts omitted from the affidavit are clearly critical to a finding of probable cause[,] the fact

---

[150] *See United States v. Ramirez*, 180 F. Supp. 3d 491 (W.D. Ky. Apr. 12, 2016) (stating "[p]ossessing a cell phone during one's arrest for a drug related conspiracy is insufficient by itself to establish a nexus between the cell phone and any alleged drug activity"); *United States v. Oglesby*, 2019 WL 1877228, at *7 (S.D. Tex. April 26, 2019) (accord).
[151] 719 F. App'x 319 (5th Cir. 2018) [hereinafter *Ortega II*]. The *Ortega I* court remanded for the district court to determine the affiant's state of mind. The district court's determination was appealed on Ortega II.
[152] *Id.*
[153] *Id.* at 324 (cleaned up).
[154] *Id.* at 325.
[155] *Id.*
[156] *Id.* (cleaned up).
[157] *United States v. Namer*, 680 F.2d 1088, 1094 (5th Cir. 1982); *see also Ortega II*, 719 F. App'x at 325 (quoting the same sentence of *Namer*).

Document Number: 70377

of recklessness may be inferred from proof of the omission itself."[158] The same must hold

true for materials misstatements since both are treated similarly.[159]

Gaulden argues that Cpl. Barnett intentionally or recklessly included false statements in numerous parts of the warrants, but the Court has identified the first sentence of the SD Card Media warrant as the critical issue. Gaulden argues that Cpl. Barnett intentionally used September 28th as the day he and the Street Crimes Unit received the information from the reliable source so that there would be probable cause to search the SD cards and camera.[160] He points to the first sentence of three other affidavits that Cpl. Barnett wrote prior to the affidavit for the warrant for the SD Card Media.[161] The first sentences in each of the prior affidavits are identical to each other, but slightly different from the first sentence of the SD Card Media warrant.[162] The three prior warrants omitted the date and time "[on] September 28th, 2020 at approximately 1600 hours" and instead begin with "[m]yself along with the Street Crimes Unit received information from a reliable source…"[163] Additionally, the three prior warrants stated that the reliable source informed Cpl. Barnett and the Street Crimes Unit that the "several subjects" were "branishing [sic] firearms," but did not state that the reliable source conveyed that a rap video was being filmed.[164] In sum, Gaulden argues that "[Cpl.] Barnett

---

[158] *Namer*, 680 F.2d at 1094 (quoting *United States v. Martin*, 615 F.2d 318, 328 (5th Cir. 1980)) (alteration in original).

[159] *Martin*, 615 F.2d at 328.

[160] Rec. Doc. No. 156, p. 10.

[161] *See* Defense Exhibit 33 (affidavit in support of warrant to search Dodge Ram, submitted at 6:47 p.m.); Defense Exhibit 29 (affidavit in support of warrant to search Cadillac Escalade, submitted at 6:38 p.m.); and Defense Exhibit 79 (affidavit in support of warrant to search Acura SUV, submitted at 6:45 p.m.); Defense Exhibit 29 (affidavit in support of warrant to search SD cards, camera, and computer, submitted at 9:38 p.m.).

[162] *See* Defense Exhibit 33, 29, 79.

[163] *See* Defense Exhibit 33, 29, 79.

[164] *See* Defense Exhibit 33, 29, 79.

Document Number: 70377

intentionally referenced September 28th in this one warrant because he needed that date to justify searching the film footage."[165]

The Government characterizes Cpl. Barnett's insertion of the September 28th date as a mistake.[166] In support, the Government cites Cpl. Barnett's testimony. Cpl. Barnett explained that he received information regarding two similar complaints on two separate dates (September 27th and September 28th), and he inadvertently fused the information together under the September 28th heading.[167]

The Court finds that Cpl. Barnett did not intentionally make a false statement regarding the date he received the information. While the varied wording in the different warrants is certainly curious, Gaulden's argument rests on a series of inferences that do not suffice to establish Cpl. Barnett's state of mind. The only direct evidence on the issue of Cpl. Barnett's state of mind was his own testimony, and he testified that the inclusion of the September 28th date was a mistake.[168] However, the Court must still assess whether his mistake rises to the level of recklessness contemplated by *Franks*.

Gaulden's argument as to recklessness tracks his argument that the statements were intentionally false. The Government's argument as to recklessness is more nuanced. The Government points to several factors that it asserts explain Cpl. Barnett's mistake as to the date: Cpl. Barnett was not present on September 27th; at the time he was writing the affidavits on September 28th, he was fielding information from numerous officers on the scene; and, Cpl. Barnett drafted the affidavits during the chaos of an active

---

[165] Rec. Doc. No. 156, p. 10.
[166] Rec. Doc. No. 157, p. 13.
[167] *Id.*
[168] Rec. Doc. No. 150, p. 100.

Document Number: 70377

crime scene.[169] Additionally, the Government directs the Court to Cpl. Barnett's plausible understanding of the false statement. Cpl. Barnett's plausible understanding that the statement was correct "stems from the fact that he received the information from his Street Crimes unit supervisor, Kennedy, on September 28th, 2020 who had received it from Barcelona also on September 28th, 2020."[170] In sum, the Government characterizes Cpl. Barnett's plausible understanding as "his unit received the information on September 28, 2020."[171]

The Court agrees that the Government's argument that Cpl. Barnett's understanding of the first sentence of the affidavit[172] is a plausible one. However, Cpl. Barnett's plausible understanding is not the "vital factor" in this inquiry.[173] Indeed, while the *Ortega II* court characterized the affiant's plausible understanding as the most important factor in *that* case,[174] the court referred to the same factor as "weigh[ing] in favor of mere negligence and against recklessness," which indicates that it is not determinative.[175] The plausible understanding factor is not determinative because an affiant may have had a plausible understanding given his knowledge of the surrounding circumstances, but the affiant may still have been reckless in his presentation of the facts when that presentation is divorced from the affiant's background knowledge and delivered to the issuing judge.

---

[169] Rec. Doc. No. 157, p. 10–11.
[170] *Id*. at 15.
[171] *Id*.
[172] "On September 28th, 2020 at approximately 1600 hours, myself, along with the Street Crimes unit received information from a reliable source that subjects affiliated with the street gang "Never Broke Again" (NBA) and "Bottom Boy Guerillas" (BBG) were at 3866 Chippewa St. (an abandoned residence) and the abandoned lot located on the East side of the mentioned residence filming a rap video, brandishing firearms." Defense Exhibit 26.
[173] Rec. Doc. No. 157, p. 15.
[174] *Ortega II*, 719 F. App'x at 325.
[175] *Id*. at 326.

The facts of *Ortega II* illustrate why this case is different. As explained in detail above,[176] the affiant in *Ortega II* indicated that he had conversed directly with an informant when in fact a different officer had conversed with the informant in the presence of the affiant but in Spanish, which the affiant did not understand.[177] Therefore, the court held that the statement in the affidavit that the affiant "receive[d] information from a credible and reliable person…" was false.[178] However, the court characterized the affiant's plausible understanding as "a slight stretch but not totally baseless for [the affiant] to say he receive[d] information when he was present while it was conveyed, understood some of it, and had the rest translated to him."[179] In *Ortega II*, the falsity did not change the facts that made their way to the magistrate—only their vehicle.

This case is different because of the temporal nature of Cpl. Barnett's falsity. While the affidavit in *Ortega II* alleged ongoing criminal conduct, the affidavit in this case alleged information about conduct, specifically the filming of a rap video, at a *distinct* time and place.[180] Here, the information was stale, but Cpl. Barnett presented the source information as contemporaneous, whereas in *Ortega II* the information was not stale— only the route by which it arrived at the affiant was false. Since the alleged filming of a rap video is critical to establishing probable cause to search for the SD Card Media, the exact timing of when the reliable source first reported the rap video is of paramount

---

[176] See *supra* text accompanying notes 112–114.
[177] *Id.*
[178] *Ortega II*, 719 F. App'x at 326.
[179] *Id.* at 325–26 (cleaned up).
[180] This case would be analogous to the facts of *Ortega II* if the source in that case provided information that the defendant would possess cocaine on September 27th, but the affiant wrote that he (the affiant) received the information on September 28th.

Document Number: 70377

importance. Therefore, Cpl. Barnett's plausible understanding may still amount to a reckless falsity.

The Government is correct that Cpl. Barnett was not at the scene on September 27th, however, Cpl. Barnett testified that he was informed of what happened on September 27th while he was writing the relevant warrants.[181] He also testified that while he was preparing the warrant, he was aware that the September 27th tip was uncorroborated and stale.[182] Critically, Cpl. Barnett failed to inform the issuing judge that the information was stale and could not be corroborated. While the fact that Cpl. Barnett was receiving information from multiple sources while writing the affidavit could contribute to a mistake, a barrage of information would have resulted in the inclusion of more information in the affidavit—not less, as was the case here. And finally, while the evidence adduced at the hearing indicated that Cpl. Barnett drafted the applications for the vehicle warrants during an active crime scene, he submitted the application for the warrant to search the camera, SD cards, and computer around 9:30 p.m.—well after the police officers arrived on, and secured, the scene.[183]

The Court turns to the recklessness factors identified in *Ortega II*. The court stated that recklessness "may be shown circumstantially when reasons to doubt the information's veracity are obvious."[184] As the Court explained above, Cpl. Barnett could have plausibly intended to convey that he received the information that originally came from the reliable source on September 28th. However, a plain reading of the false

---

[181] Rec. Doc. No. 147, p, 102–3. He confirmed this on cross-examination. *Id*. at 133.
[182] *Id*. at 103.
[183] *See* Defense Exhibit 26.
[184] *Ortega II*, 719 F. App'x at 324 (cleaned up).

Document Number: 70377

statement[185] leads to the conclusion that the reliable source informed Cpl. Barnett and the Street Crimes Unit about a group of people brandishing firearms and filming a rap video on September 28, 2020. As Cpl. Barnett testified,[186] this was not the case. Thus, it was obvious, and should have been known to Cpl. Barnett at the time that he drafted the affidavit, that the wording of the false statement would cause the issuing judge to draw a false conclusion. This factor weighs in favor of a finding of recklessness.

*Ortega II* also instructed that "the less damaging the whole truth is to the affiant, the weaker the inference that the affiant made a statement or omission with reckless disregard for the truth."[187] The whole truth would have included that the tip about the rap video came in on September 27th—not September 28th—which would have negated probable cause to search the SD cards and camera for evidence of who possessed firearms or narcotics on September 28th. The whole truth would have included that the information from the September 27th tip could not be corroborated. This would have negated probable cause to search the SD cards and camera since there would have been no reliable information related to a rap video. This factor weighs in favor of a finding of recklessness.[188]

---

[185] "On September 28th, 2020 at approximately 1600 hours, myself, along with the Street Crimes unit received information from a reliable source that subjects affiliated with the street gang "Never Broke Again" (NBA) and "Bottom Boy Guerillas" (BBG) were at 3866 Chippewa St. (an abandoned residence) and the abandoned lot located on the East side of the mentioned residence filming a rap video, brandishing firearms." Defense Exhibit 26.

[186] Rec. Doc. No. 147, p, 102–3, 133.

[187] *Ortega II*, 719 F. App'x at 325.

[188] The exact boundaries of what should be considered "the whole truth" are unclear. The Court focuses on the omissions about the lack of corroboration because that portion of the "whole truth" is most relevant to determining Cpl. Barnett's state of mind. However, the argument could be made that the "whole truth" should include the information from the September 28th anonymous 911 call. But even if the information from that call were included, there would still be no basis to assume that a rap video was being filmed on September 28th because the anonymous caller did not say that. *See* Government Exhibit 1.

Document Number: 70377

Finally, the Court turns to the materiality of the false statement, which may be determinative.[189] The false statement is the sole basis for probable cause. Thus, the false statement is extremely material. This factor weighs in favor of a finding of recklessness.

In conclusion, the Court finds that Cpl. Barnett was reckless when he inserted the false statement into the affidavit and omitted material information. Despite the plausibility of Cpl. Barnett's understanding of the false statement, a plain reading of it is extremely misleading insofar as it would lead the issuing judge to have a woefully incorrect understanding of the facts. The warrant was unconstitutional, and unless the *Leon* good faith exception to the exclusionary rule applies, the SD Card Media must be suppressed. The Court will consider the good faith exception after consideration of the warrant's technical invalidity.

### 2.  Technical Invalidity of the Warrant

It became clear during the hearing that there are technical defects in the warrant. As such, the Court ordered supplemental post-hearing briefs,[190] and the parties complied.[191] The Court ordered the parties to address three questions: (1) is the affidavit incorporated into the warrant?; (2) if so, does this incorporation cure the warrant from any lack of particularity?; and (3) does the warrant's express authority to seize the camera and SD cards extend to authority to search the same? The Court finds that even if the SD Card Media warrant is not voided under *Franks*, the technical insufficiencies in the warrant render it unconstitutional.

### a.  Is the Affidavit Incorporated into the Warrant?

---

[189] *United States v. Namer*, 680 F.2d 1088, 1094 (5th Cir. 1982); *see also Ortega II*, 719 F. App'x at 325.
[190] Rec. Doc. No. 160.
[191] Rec. Doc. Noa. 161, 162.

Document Number: 70377

Yes. Gaulden concedes that the affidavit is incorporated into the warrant.[192] Further, it is incorporated as a matter of law because it is referenced in the warrant.[193] But Gaulden advances a related argument.

Gaulden cites *United States v. Haydel*,[194] a Fifth Circuit case, for the proposition that if the description on the face of the warrant fails to "fairly direct attention to the place actually searched, [the Court] would be compelled to hold the search illegal without further discussion."[195] Gaulden invokes this rule because the warrant provides, in relevant part:

> Affidavit having been made before me by Joshua Barnett of the Baton Rouge Police Department, that he has good reason to believe that on or in:
> A Black Sony 7R Digital Camera (Serial # : 3388629) on a rotating mount, Mac book Pro computer Sd Cards
> located at the address: 3866 Chippewa St., [B]aton [R]ouge, LA, there is now being concealed certain property,
> Sony 7R camera, Macbook Pro computer, Sd Cards
> is/are located, which property constitutes evidence of:
> [distribution or possession with the intent to distribute marijuana, possession of a firearm by a felon, and illegal carry of weapons]….[196]

The problem with this portion of the warrant is that the camera, computer, and SD cards were not at 3866 Chippewa St. Rather, as Cpl. Barnett testified, they were in the back of a police unit.[197] According to Gaulden, the warrant fails to particularly or accurately identify the location of the items it is authorizing the search of because the camera, computer, and SD cards were not located at 3866 Chippewa St.[198]

Gaulden's argument is misplaced. While the inclusion of 3866 Chippewa St. as a place to be searched in the affidavit and warrant is—frankly—bizarre given that there is

---

[192] Rec. Doc. No. 161, p. 1–2.
[193] *United States v. Triplett*, 684 F.3d 500, 505 (5th Cir. 2012).
[194] 649 F.2d 1152 (5th Cir. Unit A 1981).
[195] *Id*. at 1157.
[196] Defense Exhibit 26 (spacing in original).
[197] Rec. Doc. No. 147, p. 82.
[198] Rec. Doc. No. 161, p. 3.

Document Number: 70377

no evidence that anything relevant occurred inside the house, the warrant also describes as the place to be searched the camera, computer, and SD cards. The warrant thus "fairly direct[ed] attention to the place actually searched."[199]

b.  *Does the Incorporation of the Affidavit into the Warrant Cure it from Any Lack of Particularity?*

No. The threshold question is whether the warrant lacks particularity on its face. The Fourth Amendment provides: "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, *and the persons or things to be seized*."[200] The relevant part of the warrant, quoted above, does not describe the items to be seized. Rather, the warrant literally states that "in or on" the camera, computer and SD cards "there is now being concealed certain property," namely, the camera, computer, and SD cards. The warrant continues, "You are hereby ordered to search forthwith the aforesaid [(the camera, computer and SD cards)] for the property specified [(again, the camera, computer, and SD cards)]…."[201] The warrant did not describe the "thing to be seized" as the photographic or video evidence, and therefore fails under the Fourth Amendment. Now, the Court may turn to the fundamental question of particularity.

The Fifth Circuit "has held that the particularity requirement may be satisfied by reliance on an affidavit when the affidavit is incorporated by reference into the warrant."[202]

---

[199] *Haydel*, 649 F.2d at 1157.

[200] U.S. Const. amend. IV (emphasis added).

[201] If the words "camera, computer, and SD cards" were replaced with "red shoe", the warrant would state that the red shoe located at 3866 Chippewa Street is concealing a red shoe which constitutes evidence of the listed crimes. In other words, it is nonsensical.

[202] *United States v. Shugart*, 117 F.3d 838, 845 (5th Cir. 1997) (internal citations omitted). The *Shugart* court cited a Fifth Circuit case in support of this proposition. However, the court, in the same citation, cited

Document Number: 70377

"The applicable test requires [the] court to ask whether the description in the warrant would permit an executing officer to reasonably know what items are to be seized."[203]

The affidavit contains two relevant statements. First, "[d]ue to the several subjects in custody being convicted felons and the narcotics[,] the camera footage needs to be seen to see who possessed which firearms that were located at the scene."[204] Second, "I respectfully request permission to look through the Sony 7R camera, SD cards, and Macbook pro to help determine who had possession of which firearm."[205] While it can be gleaned from these two quotes that Cpl. Barnett desired to search the camera, SD cards, and computer for photographic or video evidence, the warrant still fails for lack of particularity even once the affidavit is incorporated. As the Fifth Circuit has explained, "[t]he Fourth Amendment's particularity requirement demands that the place to be searched and the items to be seized be described with sufficient particularity so as to leave nothing to the discretion of the officer executing the warrant."[206] Here, after drawing favorable inferences in favor of the affidavit, the request is for completely unbridled discretion to search a camera, an unspecified number of SD cards, and the entirety of a computer. Moreover, the request has no temporal boundaries. In other words, the officer executing the warrant could, within the constraints of the language incorporated from the affidavit, have searched every file on the computer and viewed every picture and video

---

as a proposition analogous to the contrary of the main proposition, a prior Fifth Circuit Unit A case for the notion that "[a]n insufficient warrant cannot be cured by the most detailed affidavit." *Haydel*, 649 F.2d at 1157. Since *Groh* was decided in 2004, the continued validity of *Haydel* is questionable. As such, the Court does not rely on *Haydel*. However, if *Haydel* remains good law, the warrant in this case is plainly insufficient and the affidavit cannot save it. The forthcoming analysis is unnecessary, and the inquiry should proceed straight to good faith.
[203] *Shugart*, 117 F.3d at 845 (internal citations omitted).
[204] Defense Exhibit 26.
[205] *Id.*
[206] *United States v. Allen*, 625 F.3d 830, 835 (5th Cir. 2010).

on the SD cards and camera—not just those files and media that possibly contained evidence related to September 28th. Therefore, even after the affidavit is incorporated, the warrant lacks particularity because it leaves far too much discretion to the officer executing the warrant. Because the warrant lacks particularity, it violates the Fourth Amendment and is unconstitutional. But before the Court considers the good faith exception to the exclusionary rule, the warrant has another significant problem.

c. *Did the Warrant's Express Authority to Seize the Camera, Computer, and SD Cards Extend to Authority to Search the Camera and SD Cards?*

No. In relevant part, the warrant provides:

[1][207] Affidavit having been made before me by Joshua Barnett of the Baton
[2] Rouge Police Department, that he has good reason to believe that on or
[3] in: A Black Sony 7R Digital Camera (Serial # : 3388629) on a rotating
[4] mount, Mac book Pro computer Sd Cards
[5] located at the address: 3866 Chippewa St., [B]aton [R]ouge, LA, there
[6] is now being concealed certain property,
[7] Sony 7R camera, Macbook Pro computer, Sd Cards
[8] is/are located, which property constitutes evidence of:
[9] 1 Count of RS40:966A(MARIJUANA)—Distribution/Possession with the
[10] Intent to Distribute Marijuana, or synthetic cannabinoids—(FELONY)
[11] 1 Count of RS14:95.1—Possession of Firearm by Person Convicted of
[12] Certain Felonies—(FELONY)
[13] 1 Count of RS 14:95 E—Illegal Carry of Weapons;Crime or CDS
[14] (Felony)—FELONY)
[15] of the Louisiana Revised Statues, and the affidavit submitted in support
[16] of the search warrant show the necessary probable cause for its
[17] issuance. The purpose and reason for the search is to find and seize
[18] the item(s) listed above.
[19] YOU ARE HEREBY ORDERED to search forthwith the aforesaid for
[20] the property specified serving this Search and Seizure Warrant and
[21] making the search during the day time or night time, Sundays or
[22] holidays, and if the thing(s) specified are found there, to seize and hold
[23] them in safe custody pending further orders of the court. This shall be
[24] your warrant, whereof you are to make due return according to
[25] law.[208]

---

[207] Line numbers are not present in the original. The Court has added them for ease of reference.
[208] Defense Exhibit 26 (spacing in original).

The Government argues that the warrant should be read as follows: "'The purpose and reason for the search is to find and seize the item(s) list above.' The warrant commands [Cpl.][209] Barnett to 'search forthwith the aforesaid property [Ramsey's camera, SD cards, and Macbook Pro computer][210] for the property specified [evidence of the enumerated felony offense][211] …[212] seize it and hold them safe pending further orders of the court."[213] In contrast, Gaulden asserts that "[t]he only 'search' that's authorized is a search in order to find the items, not a search of what's inside the items."[214]

A plain reading of the warrant text favors Gaulden. From lines [3] to [8] the warrant authorizes the seizure of the camera, SD cards, and computer. But the "certain property" described in line [6] is again, the camera, SD cards, and computer. Turning to lines [19] and [20], the warrant authorizes the executing officer to search the "aforesaid for the property specified." The "aforesaid" must be what is described in the warrant as the thing to be searched on lines [3] and [4]—the camera, SD cards, and computer. The "property specified" must be the "concealed certain property" referenced in line [6]. Line [7] describes the "concealed certain property" as the "Sony 7R camera, Macbook Pro computer, Sd cards." Additionally, lines [17] and [18] describe the purpose of the search as "to find and seize the items listed above." The only items listed on the warrant are the camera, SD cards, and computer. Therefore, lines [19] and [20] order the executing officer to search the camera, SD cards, and computer in order to find the camera, SD cards, and

---

[209] The Court's alteration.
[210] The Government's alteration.
[211] The Government's alteration.
[212] The Government's alteration.
[213] Rec. Doc. No. 162, p. 3.
[214] Rec. Doc. No. 161, p. 5.

Document Number: 70377

computer. Critically, lines [22] and [23] order the executing officer to seize and hold the "thing(s) specified" if they are found. The only "thing(s) specified" in the warrant are the camera, computer, and SD cards. In sum, the warrant does not authorize the executing officer to search for photographs or videos in the camera, SD cards, or computer.[215] As such, the SD Card Media must be suppressed, unless the *Leon* good faith exception to the exclusionary rule applies.

### 3.  Application of the *Leon* Good Faith Exception to the Exclusionary Rule

The Fourth Amendment, on its face, provides rights, but fails to provide remedies for violations of those rights.[216] In order to "compel respect for the constitutional guaranty," the Supreme Court created the exclusionary rule, which sometimes requires suppression of evidence seized in violation of a defendant's constitutional rights.[217] For better[218] or worse,[219] "[e]xclusion is not a personal constitutional right, nor is it designed to redress the injury occasioned by an unconstitutional search."[220] Rather, "[t]he rule's sole purpose…is to *deter* Fourth Amendment violations."[221] Because that deterrence comes at the "substantial social costs" of suppressing the truth and often allowing a criminal to go free, the Supreme Court requires that the "deterrence benefits of suppression must outweigh its heavy costs."[222] The value of deterrence varies with the "culpability of the

---

[215] The Court is cognizant that this error may be due to some quirks in the Cloudgavel electronic warrant software used by BRPD. This explanation for the errors is not a sufficient excuse, however, because the mandates of the Fourth Amendment do not change to conform to the idiosyncrasies of the warrant delivery system that law enforcement chooses to use.

[216] *Davis v. United States*, 564 U.S. 229, 236 (2011).

[217] *Id*. (cleaned up).

[218] *See generally*, Eugene R. Milhizer, Debunking Five Great Myths About the Exclusionary Rule, 211 Mil. L. Rev. 211 (2012).

[219] *See generally*, Thomas K. Clancy, The Fourth Amendment's Exclusionary Rule as a Constitutional Right, 10 Ohio St. J. Crim. L. 357 (2013).

[220] *Davis*, 564 U.S. at 236 (cleaned up).

[221] *Id*. (emphasis added).

[222] *Id*. at 237 (cleaned up).

Document Number: 70377

law enforcement conduct at issue."[223] "When the police exhibit deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights, the deterrent value of exclusion is strong and tends to outweigh the resulting costs."[224] However, "when the police act with an objectively reasonable good-faith belief that their conduct is lawful or when their conduct involves only simple, isolated negligence, the deterrence rationale loses much of its force, and exclusion cannot pay its way."[225]

In *United States v. Leon*[226] the Supreme Court considered the application of the exclusionary rule to an invalid warrant. The deterrent effect of the exclusionary rule is severely diminished, if not eradicated, when a police officer acts in "the objectively reasonable belief that [his] conduct did not violate the Fourth Amendment."[227] As the *Leon* Court stated, "[s]earches pursuant to a warrant will rarely require any deep inquiry into reasonableness, for a warrant issued by a magistrate normally suffices to establish that a law enforcement officer has acted in good faith in conducting the search."[228] Further:

> In most such cases, there is no police illegality and thus nothing to deter. It is the magistrate's responsibility to determine whether the officer's allegations establish probable cause and, if so, to issue a warrant comporting in form with the requirements of the Fourth Amendment. In the ordinary case, an officer cannot be expected to question the magistrate's probable-cause determination or his judgment that the form of the warrant is technically sufficient.[229]

---

[223] *Id*. at 251 (cleaned up).
[224] *Id*. at 238 (cleaned up).
[225] *Id*.
[226] 468 U.S. 897, 918 (1984).
[227] *Id*. at 918.
[228] *Id*. at 922 (cleaned up).
[229] *Id*. at 920–21.

Document Number: 70377

Therefore, "when an officer acting in objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope," suppression is inappropriate even if the warrant is invalid.[230]

The *Leon* Court also recognized that if a police officer acts in objectively unreasonable good faith, the justifications for the good faith exception disappear and suppression is the appropriate remedy.[231] "The officer's reliance on the magistrate's probable-cause determination and on the technical sufficiency of the warrant he issues must be objectively reasonable, and it is clear that in some circumstances the officer will have no reasonable grounds for believing that the warrant was properly issued."[232] The *Leon* Court described four situations where suppression "remains an appropriate remedy."[233] As summarized by the Fifth Circuit, suppression is appropriate when:

> (1) the issuing-judge was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth; (2) the issuing-judge wholly abandoned his judicial role in such a manner that no reasonably well trained officer should rely on the warrant; (3) the underlying affidavit is bare bones (so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable); or (4) the warrant is so facially deficient that the executing officers cannot reasonably presume it to be valid.[234]

In sum, the *Leon* Court held that the good-faith exception turns on the officer's objective reasonableness.[235]

The good faith exception does not apply in this case for two reasons. First, the first *Leon* situation applies because Cpl. Barnett recklessly included false information that

---

[230] *Id*. at 920.
[231] *Id*. at 923–24.
[232] *Id*. at 922–23.
[233] *Id*. at 923.
[234] *United States v. Mays*, 466 F.3d 335, 343 (5th Cir. 2006).
[235] *Leon*, 468 U.S. at 924.

Document Number: 70377

misled the issuing judge.[236] Second, the officer who executed the warrant could not have acted in objectively reasonable good faith because the warrant was so facially deficient that the executing officer could not have reasonably presumed that it was valid.

The Fifth Circuit applied *Leon* in *United States v. Allen*.[237] In *Allen*, the Government conceded that the challenged warrant was not sufficiently particularized and that, while there was an attachment that listed the items to be seized, it was not incorporated into the warrant.[238] The court found that the executing officer acted in good faith because "[t]he warrant, along with the affidavit and attached list of items to be seized, had been reviewed, [prior to its submission to the magistrate judge], at many levels [(including the U.S. Attorney's office)], and the affidavit had been signed by the magistrate judge."[239] The court noted that "the magistrate judge's signature on the affidavit reduces the concern that he did not agree to the scope of the search as defined and limited therein."[240] The court ultimately concluded that the affiant was merely negligent in failing to properly incorporate the list of items to be seized; therefore, suppression of the evidence would yield no deterrent effect, so exclusion was inappropriate.[241]

The facts of this case bear a passing resemblance to those of *Allen*. Sgt. Kennedy testified that he helped Cpl. Barnett prepare the affidavit, which presumably included reviewing it. Likewise, the issuing judge signed the affidavit.[242] The first mistake, failing to particularize the items to be seized, is akin to the mistake in *Allen*. The affidavit included

---

[236] See supra, notes 183–188 and accompanying text.
[237] 625 F.3d 830, 836 (5th Cir. 2010).
[238] *Id*. at 835.
[239] *Id*. at 838.
[240] *Id*. at 839.
[241] *Id*. at 837.
[242] Defense Exhibit 26.

Document Number: 70377

the request to "look through the Sony 7R camera, SD cards, and MacBook pro to help determine who had possession of which firearm."[243] Thus, as in *Allen*, it can be gleaned that the issuing judge understood what Cpl. Barnett intended to search for. The failure to particularize, therefore, does not rise to the level of police misconduct that evokes the exclusionary rule.

The second mistake rests with the officer that executed the warrant.[244] As explained above,[245] the warrant does not authorize the search of the camera, SD cards, and computer. This failure is clear on the face of the warrant, which is barely over a page long. The executing officer should have known that he lacked legal authority to search the items listed on the warrant.

The Court finds that the executing officer's mistake of failing to read and understand the scope of authority that the warrant conveyed rises to the level of gross negligence that the exclusionary rule is designed to deter. To hold otherwise would encourage executing officers to assume—rather than read—the contents of a warrant and structure their searches based on what the affiant requested, rather than what the issuing judge actually granted. The Court cannot find that the executing officer acted in objectively reasonable good faith when simply reading the warrant would have exposed its fatal flaw. Therefore, the *Leon* good faith exception to the exclusionary rule does not apply.

In sum, Gaulden cannot seek to suppress the firearms because he lacks Fourth Amendment standing as to them. However, he has Fourth Amendment standing as to the

---

[243] *Id.*
[244] There was no evidence adduced at the hearing as to who executed the warrant.
[245] See *supra*, notes 205–212 and accompanying text.

Document Number: 70377

SD Card Media. Suppression of the SD Card Media is appropriate because the warrant was invalid on its face, and the warrant is not saved by the good faith exception to the exclusionary rule. The warrant is also rendered invalid after the fact because Cpl. Barnett recklessly included materially misleading information within it.

### III.    CONCLUSION

For the reasons set forth above, Gaulden's *Motion to Suppress*[246] is DENIED in part and GRANTED in part.

**IT IS SO ORDERED.**

Signed in Baton Rouge, Louisiana on <u>February 24, 2022</u>.


_____
**CHIEF JUDGE SHELLY D. DICK**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

---

[246] Rec. Doc. No. 53.

Document Number: 70377